UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| INFINITY GENERAL CONSTRUCTION SERVICES, INC. a Florida corporation, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. |
| | ) | |
| CRYSTAL HOSPITALITY, LLC a Foreign corporation, and ARGONAUT INSURANCE COMPANY, a Foreign corporation, | ) ) ) ) | |
| | ) | |
| Defendants | ) | |

## COMPLAINT

The Plaintiff, Infinity General Construction Services, ("Infinity"), by and through its undersigned counsel, hereby files this Complaint and sues Defendants, Crystal Hospitality, LLC ("Crystal"), and Argonaut Insurance Company, ("Surety") and states as follows:

## Parties, Jurisdiction and Venue

1.      At all times relevant to this action, Infinity was a Florida corporation, authorized to do and conducting business in Florida.

2.      At all times relevant to this action, Crystal was a Foreign corporation, authorized to do and conducting business in Florida.

3.     At all times relevant to this action, Surety was a foreign corporation, authorized to do and conducting business in Florida.

4.     This is a matter in excess of $75,000.00.

5.     Plaintiff and both Defendants are entities with citizenship in different states.

6.     This District Court has jurisdiction pursuant to 28 USC §1332(a).

7.     Venue is proper in the United States District for the Middle District of Florida, Orlando Division pursuant to §11 of the Performance Bond which is subject to this action because the property that is the subject of this Complaint is located in Volusia County, Florida and the cause of action set forth herein accrued in Volusia County, Florida.

8.     All conditions precedent to the filing of this action have occurred, have bene performed, or have otherwise been waived.

## GENERAL ALLEGATIONS

9.     This controversy arises out of the construction of the "Renaissance Project" (the "Project") located at 640 N. Atlantic Avenue, Daytona Beach, FL 32118.

10.    The Project is a full renovation of an existing structure in addition to new construction of adjacent structures for the purposes of constructing a new, beachfront hotel in Daytona Beach, FL.

11.     On December 29, 2020 Infinity entered into an A102-2017 Agreement Between Owner and Contractor with the Owner of the Project, 640 North Atlantic Hospitality, LLC ("Owner").

12.     On February 1, 2021, Infinity and Crystal entered into a Subcontract Agreement (the "Subcontract") for the completion of that certain scope of work as defined within the attachments to the Subcontract.  A copy of which is attached hereto as Exhibit "A".

13.     Pursuant to the Subcontract, Crystal agreed to provide construction services for multiple major trades including: Drywall, Plumbing, Electrical, Exterior, Wall Finishes, Floor Finishes and Door Installation, in addition to the typical General Conditions.

14.     After executing the Subcontract, Infinity became aware that Crystal was unable to secure a licensed electrical sub-subcontractor, labor and materials necessary to complete the Electrical scope of work.  As a result, Crystal and Infinity agreed to modify the Scope of Work to remove Electrical work.

15.     On May 25, 2021, Crystal obtained Performance and Payment Bonds from Surety. The Performance and Payment Bonds is attached as Exhibit "B"

16.     Crystal began to fall behind its scope of work almost immediately upon entering the Project.

17.    In October of 2021, Infinity approved a deductive Change Order to account for material cost increases within Crystal's scope of work.

18.    In July of 2022, Crystal and Infinity (with notice to the Surety), reached an agreement to provide additional funding to Crystal in order to allow Crystal to capitalize its operation and avoid further delays.  Further, Crystal was provided with additional time under the critical path of the project.  A copy of the July Change Order is attached as Exhibit "C".

19.    Following the execution of the Change Order,  Crystal continued to cause delays to the critical path of the Project.

20.    In October of 2022, following months of additional delays, labor changes, and multiple failures by Crystal to prosecute its Scope of Work, Infinity served a Notice of Intent to Declare Default to Surety and Crystal pursuant to Section 3.1 of the Performance Bond.

21.    For the next several months, Infinity and Crystal tried to resolve issues with Crystal's work as they would appear.

22.    Ultimately, Crystal was unable to meet its contractual obligations and Infinity issued a Notice of Termination to Crystal and the Surety.  At the time of Termination, Crystal had not completed its first scope of work, Plumbing, and was well behind on the Framing scope.  A copy of the Notice of Termination is attached hereto as Exhibit "D".

23.    On May 5, 2023, Surety responded to the Notice of Termination, denying Infinity's claim. A copy of the Letter is attached as Exhibit "E".

24.    Infinity has been damaged by the delays of Crystal and factually deficient, inconclusive and contractually invalid Decision Letter and the decision of the Surety to deny the claim.

## Count I – Breach of Contract
### (Against Crystal)

25.    Infinity restates and realleges paragraphs 1 through 24 above.

26.    Infinity and Crystal entered the subcontract attached hereto as Exhibit A.

27.    Crystal failed to provide sufficient staff, supervision and materials to perform its scope of work.

28.    Crystal's mismanagement of its scope of work resulted in delays to the critical path of the project.

29.    Crystal materially breached the contract by failing to supply sufficient skilled workers, equipment, and materials of property quality and quantity.

30.    Crystal materially breached the contract by failing to prosecute their work with promptness and diligence.

31.    Crystal materially breached the contract by failing to perform under the provisions of the Contract Documents.

32.    Due to Crystal's actions and resulting delay, Infinity accrued liquidated damages, extended general conditions and other damages.

33.    Infinity has engaged the undersigned counsel and is responsible for paying reasonable attorney's fees.  Crystal is liable for those fees pursuant to the Subcontract.

WHEREFORE, Infinity respectfully requests that judgment be entered in its favor and against Crystal for damages, along with an award of costs and expenses, pre-judgment interest, post-judgment interest, and any other relief that this Court deems proper or just.

### Count II – Breach of Performance Bond
### (Against Surety)

34.    Infinity restates and realleges paragraphs 1 through 24 above.

35.    On or about May 25, 2021, Surety executed Performance Bond CMGP00004440 in the sum of $5,192,935.00.

36.    Despite providing all required notices to Surety under the Performance Bond regarding Crystal's breaches of the Contract, Surety breached its obligations under the Performance Bond by (1) issuing a denial of Infinity's claim that is factually and legally unsupported, (2) failing to consider all available facts and information in making its decision, and (3) failing to consider the claim in good faith.

6

37.     As a direct, foreseeable, and proximate result of Surety's breach of the Performance Bond, Infinity has suffered and will continue to suffer damages, including, but not limited to, direct, delay (liquidated and actual) and consequential damages.

38.     Because Surety breached its obligations under the Performance Bond, Infinity has been required to retain the undersigned attorneys to represent Infinity in this action, and Infinity is obligated to pay these attorneys a reasonable fee for their services. Infinity is entitled to attorneys' fees under the Performance Bond and sections 627.428 and 627.756, Florida Statutes.

WHEREFORE, Infinity respectfully requests that judgment be entered in its favor and against Surety for damages, along with an award of costs and expenses, including attorneys' fees pursuant to the Performance Bond and sections 627.428 and 627.756, Florida Statutes, pre-judgment interest, post-judgment interest, and any other relief that this Court deems proper or just.

KIRWIN NORRIS, P.A.

*/s/ Andrew J. Pekoe*
BRIAN P. KIRWIN
Fla. Bar No.: 867799
ANDREW J. PEKOE
Fla. Bar No.:  100347
15 West Church Street, Ste. 301
Orlando, FL 32801
P:  407-740-6600
F:  407-740-6363
*Attorneys for Plaintiff*

# **<u>EXHIBIT A</u>**



## SUBCONTRACT AGREEMENT

THIS SUBCONTRACT, effective this __February 01,_____ 2021 between **Infinity General Construction Services, Inc.,** whose address is **730 S Atlantic Ave Ormond Beach, FL 32118**, and **Crystal Hospitality, LLC__** (**"Subcontractor"**), address is __706 Executive Court Woodstock, Georgia 30189.__

## RECITALS:

WHEREAS, **640 North Atlantic Hospitality, LLC** ("Owner") is the owner of that certain hotel project located at 640 N. Atlantic Ave Daytona Beach FL 32811, known as the <u>Renaissance</u> ("Project") (as used herein, the term "Infinity GCS" shall mean and include any construction manager or consultant retained by __TBD__ ); and

WHEREAS, Infinity GCS is renovating the Project pursuant to the Plans, Specifications, Drawings, General Conditions, Special Conditions, and Addenda prepared by <u>COOPER CARRY</u> (the "Architect"), listed on Exhibit "A" attached hereto (the "Plans").

WHEREAS, Infinity GCS wishes to contract directly with Subcontractor for the services, and labor described herein as part of the renovation of the Project.

NOW, THEREFORE, in consideration of the Contract Price (as defined herein), and their mutual promises herein, the receipt and sufficiency of which are hereby acknowledged, the Subcontractor and Infinity GCS agree as follows:

1. <u>SCOPE OF WORK</u>.   The Subcontractor shall furnish and pay for all supervision, labor, tools, equipment, services and all other items necessary or required to fully perform this Subcontract to the satisfaction of Infinity GCS, together with all weather protection, theft protection, and all other protection necessary to perform and protect its portion of the work, including, without limitation, the installation and completion of all of the work described on Exhibit "B" attached hereto ("Work").

2. <u>CONTRACT DOCUMENTS</u>.   The Plans have been made available to the Subcontractor for examination, and are incorporated herein, and made a part of, this Subcontract.  All of the aforesaid, this Subcontract, its Additional Provisions (if any) and Infinity GCS' General Contract with the Owner, are hereinafter defined as the "Contract Documents".  Any shop drawings done in connection with this Subcontract, and approved by the Architect, shall become a part of the Contract Documents. The provisions of this Subcontract shall be in addition to and not in substitution for, or derogation of, any of the provisions of the other Contract Documents.  However, in the event of conflict with the other Contract Documents, this Subcontract shall govern and supersede any conflicting provisions of the other Contract Documents.

The Subcontractor represents and agrees that it has carefully examined and understands the Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which it is to be performed, and that it enters into this Subcontract on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of Infinity GCS, or any of its officers, agents, or employees.  All subsurface soil conditions are the responsibility of the Subcontractor as they relate to its Work.

  

1



2.1    Project Schedule (check one):

___1) The Subcontractor shall provide Infinity GCS such information as Infinity GCS may request, in order for Infinity GCS to prepare a final project schedule, detailing the scheduled completion for the Project as a whole (the "Project Schedule"). The Subcontractor shall have the right to give input to Infinity GCS in developing the Project Schedule. Subcontractor acknowledges and agrees that the Project Schedule shall be the product of input from the Subcontractor and other subcontractors, and shall be the collective result of all parties providing services, labor and materials to the Project; provided, however, Infinity GCS shall have the sole discretion to determine the final Project Schedule, and modify and amend the same from time to time. Subcontractor agrees that the Project Schedule, as amended from time to time, shall become, and continue to be, a part of the Contract Documents; or

_X_2) The Project Schedule is attached hereto as Exhibit "C" and is part of the Contract Documents. Infinity GCS shall have the right to amend the Project Schedule from time to time.

2.3 With respect to the Work, the Subcontractor agrees to be bound to Infinity GCS by all of the provisions of the Contract Documents.

3. <u>CONTRACT PRICE</u>. For the full performance of this Subcontract, in compliance with the provisions hereof, Infinity GCS shall pay the Subcontractor the fixed sum of **$ 7,150,000.00 cents** **($$Seven Million, One Hundred fifty thousand dollars, and 00/100 dollars**) including any applicable taxes and bond premiums (if any). The Contract Price may only be changed in accordance with the terms hereof. Subcontractor acknowledges and agrees that this is not a unit cost Subcontract.

4. <u>TAXES AND CONTRIBUTIONS</u>. The Contract Price includes, and the Subcontractor hereby accepts exclusive liability for, the payment of all federal, state, county, municipal and other taxes imposed by law or contract and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used for or in connection with the Work, including but not limited to: (a) contributions, taxes or premiums (including interest and penalties thereon) measured upon the payroll of or required to be withheld from employees; (b) sales, use, personal property and other taxes (including interest and penalties thereon), whether stated or charged separately, imposed by reason of the performance of the Work or the acquisition, ownership, furnishing or use of any materials, equipment, supplies, labor, services or other items for or in connection with the Work; or (c) pension, welfare, vacation, annuity and other union benefit contributions payable under or in connection with labor agreements.

5. <u>LAWS AND PERMITS</u>. Infinity GCS shall obtain, at its cost, the building permit necessary to commence construction of the Project. The Contract Price includes, and the Subcontractor shall obtain and pay for, all other necessary permits and licenses pertaining to the performance of this Subcontract. All permits and licenses necessary to commence the Work shall be obtained by Subcontractor prior to actual commencement of the Work. Subcontractor shall comply with and perform the Work in compliance with all applicable federal, state, municipal and local laws, codes ordinances, rules, regulations, orders, notices and requirements, including, without limitation, those relating to the Occupational Safety and Health Act, discrimination in employment, fair employment practices or equal employment opportunity, whether or not provided for by the Contract Documents, without additional charge or expense to Infinity GCS, and shall also be responsible for and correct, at its own cost and expense, any violations thereof resulting from or in connection with the performance of its Work. The Subcontractor shall upon demand furnish such proof as Infinity GCS may require showing such compliance and the correction of such violations.





6.  <u>TIME OF COMMENCEMENT AND COMPLETION; LIQUIDATED DAMAGES.</u>

6.1 The Subcontractor shall commence its Work promptly following Infinity GCS' orders to do so and shall conduct the Work as not to delay or interfere with Infinity GCS in any of its operations.  The Subcontractor shall prosecute and achieve completion of the Work on the date which isset forth in the Project Schedule, as revised from time to time, as the date of completion of the Work.

6.2 The Subcontractor shall promptly furnish all data requested by Infinity GCS for preparation and revision of a construction schedule, and shall perform the Work at the rate and in the sequence as directed by Infinity GCS or as necessary to facilitate job progress.

6.3 Should the Subcontractor be delayed in the commencement, prosecution or completion of the Work by the willful act, omission, or gross neglect of Infinity GCS or of anyone employed by Infinity GCS, or of any other contractor or subcontractor on the Project, or by no fault, neglect, act or omission on Subcontractor's part, then the Subcontractor's sole remedy shall be limited to an extension of time only and Subcontractor's shall have no claim for any damages whatsoever.  Subcontractor shall have no right to make any claim against Infinity GCS for any increase in cost or other increase of the Contract Price for acceleration of the Work following any such delay.  The Subcontractor shall not be entitled to any extension of time, however, unless a claim therefor is presented in writing to Infinity GCS within seventy-two (72) hours of the commencement of such claimed delay and is authorized by written change order.

6.4 Subcontractor and Infinity GCS each specifically acknowledge and agree that the completion of the Work by the Subcontractor on or prior to the date of completion set forth in paragraph 6.1 above, is a material part of this Subcontract, and a material inducement for Infinity GCS to enter into this Subcontract.  Subcontractor and Infinity GCS each furthermore agree that Infinity GCS will be substantially damaged if Subcontractor fails to complete the Work by the date of completion set forth in paragraph 6.1 above, or if Subcontractor shall delay the progress of the Work except for the reasons provided in paragraph 6.3 above, so as to cause any loss for which Infinity GCS may become liable, then Subcontractor shall reimburse Infinity GCS for any loss resulting from any such delay, including any liquidated damages assessed by the Owner.  Any such loss shall first be deducted from any payment due under this Subcontract, or any other Subcontract Subcontractor has with Infinity GCS on other projects, but if the amount of such damages exceeds the amount due Subcontractor, Subcontractor will pay the amount of damages in excess of the amount due Subcontractor to Infinity GCS upon demand.

7.  <u>PAYMENTS.</u>  Payments to the Subcontractor shall be made as follows:

7.1 Infinity GCS' obligation to make payment is subject to Subcontractor first submitting an application for payment on the form provided by Infinity GCS not later than the 25th  day of each month for:  (a) 90% of the value of the Subcontractor's labor and materials incorporated into the Work as computed on the basis of the Schedule of Values, prices and allowable quantities of Work as determined by Infinity GCS and the Architect; and (b) to the extent allowable by the Contract Documents, 90% of the value of materials not incorporated into the Work, but delivered and suitably stored at the Project site.  No payments shall be made for the cost of materials or furnishings not in place which are stored off site.  Prior to its first application for payment, the Subcontractor shall submit a detailed Schedule of Values in form and breakdown acceptable to Infinity GCS for use as a basis for checking the Subcontractor's monthly application for payment.  The Schedule of Values will be established for payment purposes only and shall not relieve the Subcontractor from furnishing all Work required by this Subcontract.  All applications for payment must be properly sworn and completed on a form provided by Infinity GCS.



Each application for payment shall be accompanied by copies of a budget breakdown, unpaid invoices, receipted bills, and such other documentation as Infinity GCS may request. Starting with the second application for payment, Subcontractor shall deliver partial waivers of lien for the Subcontractor, all sub-subcontractors and material suppliers for the first month's payment. Thereafter, partial waivers of lien for the previous month shall be submitted with each application of payment. The form of partial waiver of lien shall be supplied by Infinity GCS. The Subcontractor agrees that upon request by Infinity GCS, it shall furnish such information and consents of surety, if any, as Infinity GCS may require confirming the Subcontractor's entitlement to payment.

7.2 Monthly progress payments, less retainage, shall be made to the Subcontractor within _10_ days after Infinity GCS's receipt of payment from the Owner, so long as the Subcontractor is not in default or breach of this Subcontract, or is not subject to other reasons for withholding. Subcontractor shall not submit draw requests more than once every month. Infinity GCS shall have the right to withhold and to reduce any payments by reason of: (a) any indebtedness owed by the Subcontractor to Infinity GCS, (b) defective Work not remedied or defective materials not removed and replaced, (c) third party claims or liens filed or reasonable evidence indicating probable filing of such claims or liens, (d) claimed failure of the Subcontractor to make payments to its subcontractors, suppliers or laborers, (e) reasonable doubt that the Work can be completed for the unpaid balance of the Contract Price, (f) damage to Infinity GCS or another subcontractor, (g) reasonable indication that the Work will not be completed within the time set forth in Article 6 hereof, (h) unsatisfactory or untimely prosecution of the Work by the Subcontractor, or (i) any failure of the Subcontractor to comply with the Contract Documents.

7.3 When payment is based upon quantities at applicable unit prices, the Subcontractor shall substantiate the quantities and Infinity GCS shall have the right to examine, inspect, copy and audit the books and records of the Subcontractor or any sub-subcontractor in order to verify the accuracy, correctness, completeness and propriety of the quantities.

7.4 The Subcontractor expressly agrees that payments to it are contingent upon Infinity GCS first receiving payment from the Owner, and acknowledges that Subcontractor is agreeing to accept the risk that it will not be paid for the Work performed by it in the event that Infinity GCS, for whatever reason, is not paid by the Owner for such work. The Subcontractor states that it relies for payment for the Work performed on the credit and ability to pay of the Owner, and not of Infinity GCS, and thus the Subcontractor agrees that payment by the Owner to Infinity GCS shall be a condition precedent to any payment obligation of Infinity GCS to the Subcontractor. The Subcontractor further agrees that the liability of the surety on Infinity GCS' payment bond, if any, for payment to the Subcontractor, is subject to the same conditions precedent as are applicable to Infinity GCS' liability to Subcontractor.

7.5 The obligation to make final payment shall not become due unless and until each of the following express conditions precedent shall have occurred: (a) Final payment by the Owner has been received by Infinity GCS; (b) the Subcontractor shall have furnished evidence satisfactory to Infinity GCS that there are no claims, obligations or liens for labor, services, materials, equipment, taxes or other items performed, furnished or incurred for or in connection with the Work, including, without limitation, final waivers and releases of lien from all sub-subcontractors, material suppliers and any other potential lienors utilized by Subcontractor in performing the Work; (c) the Subcontractor shall have executed and delivered, in a form satisfactory to Infinity GCS, a Final Waiver and Release of Lien in favor of Infinity GCS, together with a Final Payment Affidavit, stating that all sub-subcontractors and material suppliers utilized by Subcontractor have been paid, or those parties who remain unpaid, and the sums due each; (d) if applicable, the Subcontractor shall have delivered to Infinity GCS written consent of its surety to final payment; (e) that the Owner and Architect shall have accepted the Work and certified it as complete, and

 



(f) Subcontractor shall have completed and delivered to Infinity GCS all as-built drawings of the Work. Final payment to the Subcontractor shall constitute a waiver of any and all past, present and future claims by the Subcontractor against Infinity GCS relating to or arising out of this Subcontract.

7.6 Progress or final payments shall not be an acceptance of improper, faulty or defective Work or materials, nor shall it release the Subcontractor of any of its obligations under this Subcontract, nor shall it constitute a waiver of any rights or provisions hereof by Infinity GCS. Beneficial use or occupancy of the Project is not acceptance of the Work.

7.7 The Subcontractor shall pay promptly for all materials, skills, labor and equipment used in or in connection with the performance of the Work, when bills or claims become due, and shall save and protect the Project and defend, indemnify and hold harmless Infinity GCS from and against all claims, bond claims, equitable liens, mechanics' liens, construction liens, damages, losses and expenses on account thereof (including without limitation attorneys' fees, costs and disbursements paid or incurred by Infinity GCS in connection therewith). Subcontractor shall pay or transfer to bond any lien filed by any of its sub-subcontractors, material suppliers or laborers within (10) days of Subcontractor's receipt of notice of such lien. At Infinity GCS' option, checks may be made jointly payable to Subcontractor's suppliers and/or subcontractors. IF at any time there shall be evidence of any lien or claim for which, if established Infinity GCS or Owner might become liable, and which is chargeable to Subcontractor, Subcontractor shall immediately take all necessary steps to either satisfy, discharge, or bond of such lien or claim.

8. <u>PROSECUTION OF WORK</u>. The Subcontractor shall perform its Work in a diligent, efficient and skillful manner in accordance with job progress and as the Work or any portion thereof becomes available to allow Infinity GCS to promote the general progress of the entire construction so that the Subcontractor's Work shall not interfere, hinder or delay other work. Time is of the essence to this Subcontract.

8.1 Should the Subcontractor fail to timely perform its Work or to furnish sufficient skilled workers, equipment or materials, so as to delay the progress of the Work or of the Project, then the Subcontractor shall work whatever hours and means as may be necessary to meet and maintain job progress without additional compensation and shall be liable and reimburse Infinity GCS for liquidated or actual damages to others, and for Infinity GCS's costs and actual damages. If, in the opinion of Infinity GCS, Subcontractor fails to maintain job progress, Infinity GCS may direct Subcontractor to take such steps as Infinity GCS deems necessary to improve the rate of progress, including requiring Subcontractor to increase the labor force, number of shifts and/or overtime operations, days of work or other remedies, and to submit for approval an outlined schedule demonstrating the method under which the required rate of progress will be regained without additional cost to Infinity GCS. Infinity GCS may, upon reasonable notice, require Subcontractor to execute in preference to other parts of the Work, such parts as Infinity GCS may specify. In addition, Infinity GCS shall have the right, after forty-eight (48) hours of written notice to Subcontractor, to supplement Subcontractor's workers in order to improve the rate of progress and timely completion of the Work. Infinity GCS shall only be required to serve this notice one time, and upon such service, shall be authorized to supplement Subcontractor's workers for the balance of the Project as deemed appropriate by Infinity GCS. All costs of performing this Work shall be charged to Subcontractor.

8.2 The Subcontractor shall promptly secure delivery commitments, place orders for materials, equipment and services required for or in connection with the Work to avoid delays, and shall furnish copies of procurement efforts and purchase orders upon request. The Subcontractor shall furnish all





goods, materials, equipment and services in compliance with all applicable safety, certification and testing codes and laws. Subcontractor shall not substitute any products or equipment from that set forth in the Contract Documents, without the prior written consent of Infinity GCS.

8.3 Shipments of all goods, materials and equipment to the Project shall be consigned to the Subcontractor c/o Infinity GCS with all transportation, freight or delivery charges prepaid by the Subcontractor, and the Subcontractor shall be solely responsible for receiving and unloading shipments. Subcontractor shall not purchase any equipment, products or materials to be incorporated into the Work on a conditional sales contract basis or any other basis upon which title to such equipment, product or materials does not immediately and unconditionally transfer to Infinity GCS upon payment.

8.4 The Subcontractor shall clean up and remove all rubbish and debris caused by its operations and in connection with the execution of its Work to the satisfaction of Infinity GCS. Should Subcontractor fail to do so, then after forty-eight (48) hours' written notice given one time, Infinity GCS may proceed to perform this work and charge the cost to the Subcontractor. Such clean up work shall include, without limitation: (a) removal of temporary protections; (b) removal of marks, stains, fingerprints and other soil or dirt from painted, decorated, and natural-finished woodwork and other work; (c) clean aluminum in accordance with recommendations of the manufacturer; and (d) restore landscaping and grounds to pre-work condition.

8.5 The Subcontractor shall be solely responsible for the protection of its Work and for loss or damage, however caused, to materials, tools, equipment, appliances or other personal property, owned or rented or used by the Subcontractor in the performance of its Work. Subcontractor shall be liable for any damages to adjacent surfaces and/or the work of other subcontractors on the Project, caused by its Work either accidentally or through negligence, including damages resulting from Subcontractor's cleaning.

8.6 Upon completion of the Work, but prior to Subcontractor's submission of the request for final payment, Subcontractor will assist the Architect in preparing, in duplicate, as-built drawings of the Work, showing the final location, by centerline stationing or other measurements, of all lines, fittings, valves and appurtenances, all revisions and sizes and types, widths, lengths and depths, and all information necessary to locate or operate concealed or buried valves, fittings and equipment installed. The Subcontractor shall record as-built conditions on the Plans and Detail Drawings on a weekly basis during the performance of its Work.

8.7 Notwithstanding the dimensions given on the Plans, Detail Drawings, Specifications and other Contract Documents, it shall be the obligation of the Subcontractor to take such measurements as will ensure the proper matching and fitting of the Subcontractor's Work.

8.8 The Subcontractor shall promptly prepare and submit to Infinity GCS such shop drawings, submittals and samples as may be necessary to describe completely the details and construction of the Work and to ensure timely fabrication, delivery and installation of the Work. Approval of such shop drawings by Infinity GCS and the Architect shall mean that the submission conforms only to the general concept of the Project, and shall not relieve the Subcontractor of its obligation to perform the Work in compliance with the Contract Documents, nor of its responsibility for the proper matching and fitting of the Work with contiguous work.

8.9 Should the performance of the Work hereunder depend upon the performance of the other work not covered by this Subcontract, the Subcontractor shall carefully examine all contiguous or other dependent work, determine whether it is in fit, ready and suitable condition for the performance of the

 

Work hereunder, report immediately any unsuitable conditions to Infinity GCS, in writing, and allow Infinity GCS a reasonable time to have such unsuitable conditions remedied. Unless the Subcontractor reports such unsuitable conditions, the Subcontractor shall be deemed to have accepted the dependent work as adequate for completion of its Work.

8.10 The Subcontractor is responsible for the intermeshing of the various parts of the Work so that no part shall be left in an unfinished or incomplete condition owing to any disagreement between its sub-subcontractors, or other subcontractors and the Subcontractor, as to where the work of one begins and ends with relation to the work of the other.

8.11 No substitutions of similar supplies, materials or equipment for items called for by the Contract Documents shall be made unless approved in writing by Infinity GCS, which approval shall not relieve the Subcontractor from the satisfactory and timely completion of all Work nor from the compliance of all Work with the Contract Documents.

8.12 Completion of the Work shall mean that the Work has been accepted by Infinity GCS and certified by Infinity GCS as complete. Without in any way limiting the discretion of Infinity GCS to accept the Work and certify it as complete, completion of the Work shall at a minimum mean that: (a) all required inspections of the Work have been made, and the Work is fully approved by any inspecting governmental authority; (b) all appropriate final inspection certificates indicating full code compliance have been issued; (c) all materials and equipment are in place, all adjustments and balancing have been done, and all corrections and adjustments noted on any pre-final and final inspection reports have been made; (d) all tests have been made; (e) all materials required to be delivered by the Subcontractor to Infinity GCS, including, without limitation, as-built drawings of the Work have been delivered to Infinity GCS; and (f) all mechanical devices and moving parts of the Work shall be fully functional for their intended uses, as determined by Infinity GCS, in its sole discretion.

8.13 By appropriate agreement, written where legally required for validity, Subcontractor shall require each of its subcontractors, to the extent of the Work to be performed by the Subcontractor, to be bound to Infinity GCS by terms of the Contract Documents, and to assume toward Infinity GCS all the obligations and responsibilities, including the responsibility for safety of the subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect.

9. LABOR. The Subcontractor shall not employ personnel, means, materials or equipment which may cause work stoppages or any disturbances or interferences by workers employed by the Subcontractor, Infinity GCS or other contractors or subcontractors on or in connection with the Work, the Project or the location thereof. However, it is understood that contracts will be awarded, and labor employed, upon the job without discrimination as whether the employees of any contractor or subcontractor are members or nonmembers of any labor organization. Subcontractor agrees that in the event of a work stoppage resulting from a labor dispute directed at the Subcontractor, Infinity GCS shall have the right to proceed as set forth herein.

10. TOOLS AND EQUIPMENT. The Subcontractor shall provide all tools and equipment necessary to perform its Work, including but not limited to scaffolds, hoisting and specialty items.

11. SAFETY. The Subcontractor shall carry on its Work in a safe manner, shall comply with all safety measures initiated by Infinity GCS or required by the Contract Documents and shall comply with all applicable laws, codes, ordinances, rules, regulations and lawful orders of any public authority for the safety of persons or property, including without limitation, the Occupational Safety and Health Act

7

A-6 



("OSHA"). Infinity GCS shall have the right to promulgate safety rules and policies from time to time, and Subcontractor shall abide by all such safety rules and policies. The Subcontractor shall be solely responsible for the protection and safety of its employees, for the final selection of all safety methods and means, for required safety reports and records, for daily inspection of its work area and its employees' safety equipment, and for the continual instruction of its employees on health and safety, including weekly safety meetings. Subcontractor shall designate one person in its employ, as Subcontractor's "safety officer", which safety officer shall be familiar with all applicable safety rules and regulations. Subcontractor shall specifically require its employees wear the proper Personal Protective Equipment according to OSHA 1926. It is Subcontractor's responsibility to specifically promulgate COVID-19 safety rules and policies for its employees. Subcontractor agrees to indemnify, defend, and hold harmless Infinity GCS, the Owner, and their agents and employees from and against any and all liabilities, claims, damages, losses, penalties, demands, judgments, actions proceedings, costs and expenses (including without limitation legal fees, costs and disbursements) arising in whole or in part out of or relating to any COVID-19 claims. When so ordered the Subcontractor shall stop any part of the Work which Infinity GCS deems unsafe until corrective measures satisfactory to Infinity GCS have been taken. Failure on the part of Infinity GCS to stop unsafe practices shall in no way relieve the Subcontractor of its responsibility therefor. In the event that the Work shall require the use of any hazardous substances (as such term is defined in the Resource Conservation and Recovery Act and the Comprehensive Environmental Response Compensation and Liability Act), Subcontractor shall handle, use, store and dispose of such hazardous substances in accordance with all applicable federal and state law. The Subcontractor does hereby agree to indemnify, defend and hold Infinity GCS harmless from any and all claims and liability arising out of or related to the Subcontractor's use, handling, storage or disposal of any hazardous substances on the Project. It is understood that Subcontractor is an independent contractor and that Infinity GCS shall have no right to direct the means and methods of the operations of employees of Subcontractor. Subcontractor agrees to maintain a familiarity with conditions existing over the entire premises on which the Work is located so that it will be aware of dangerous conditions, whether obvious or hidden, and Subcontractor agrees to warn its employees, subcontractors, and suppliers of unsafe conditions on the premises.

12. <u>CHANGE ORDERS AND FIELD WORK ORDERS</u>.

12.1 Infinity GCS shall have the right by written order (change order or field work order) without notice to Subcontractor's surety to order changes consisting of additions or deletions to the Work, or other revisions to the scope of Work or Time of Completion of this Subcontract. The Subcontractor shall submit to Infinity GCS, in writing, within five (5) days of receipt of notification of the change, or within such shorter period as may be required by the Contract Documents, any claim for adjustment of the Contract Price. Should the issuance of instructions, drawings, or directions by other than written order be claimed to result in additional costs, the Subcontractor shall submit a written notice to Infinity GCS within seventy-two (72) hours of receipt thereof and prior to commencing work thereon. The Subcontractor shall not be entitled to a change or adjustment unless authorized in writing by Infinity GCS. Subcontractor agrees that is shall under no circumstances be entitled to nor claim any costs reimbursement or compensation for additional or changed Work except to the extent that Contractor is entitled to corresponding cost reimbursement or compensation from the Owner under the Contract Documents, and then only to the extent of the amount, if any, which Contractor on behalf of the Subcontractor, actually receives from the Owner on account of such additional or changed Work.

12.2 The value of the Work to be changed, added or deleted shall be determined by one or more of the following methods or combinations thereof as Infinity GCS may elect: (a) by mutual acceptance of a lump sum with properly itemized costs; or (b) by unit prices stated in the Contract Documents or

 



subsequently agreed upon (unit prices shall be deemed to include an allowance for Subcontractor's office expense, overhead, profit and bond).

12.3 All changes, additions or omissions in the Work ordered in writing by Infinity GCS shall be deemed part of the Work hereunder and shall be performed in compliance with all the provisions of the Contract Documents.

12.4 NO VERBAL AUTHORIZATIONS OR AGREEMENTS WILL BE RECOGNIZED. IN NO EVENT SHALL SUBCONTRACTOR PROCEED WITH CHANGED OR EXTRA WORK WITHOUT A WRITTEN CHANGE ORDER OR FIELD WORK ORDER. CONTRACTOR SHALL NOT BE LIABLE FOR ADDITIONAL COSTS INCURRED OR DELAYS ENCOUNTERED IN THE PERFORMANCE OF SUCH WORK WITHOUT SUCH WRITTEN ORDER IN COMPLIANCE WITH THE ABOVE PROVISIONS.

13. <u>INSPECTION</u>.  Infinity GCS, the Architect and their authorized representatives shall have the right to inspect and test the Work (including without limitation raw materials, fabricated materials, sub-assemblies, components, assemblies, Work in process of fabrication or installation) at all times and places to verify compliance of the work with the Contract Documents and standards of good workmanship.

13.1 The Subcontractor shall provide reasonable access and sufficient and safe facilities for inspection of the Work by Infinity GCS, the Architect and their authorized representatives in the field, at shops, or at any other place where materials or equipment for the Work are in the course of preparation, manufacture, treatment or storage.

13.2 All inspections and tests are for the sole benefit of Infinity GCS and shall not relieve the Subcontractor of the responsibility for providing its own quality control measures to assure that the Work complies with the Contract Documents.  Inspection or test by Infinity GCS or the Architect shall not be construed as constituting or implying acceptance and shall not relieve the Subcontractor of responsibility for any non-compliance, damage to or loss of the Work prior to acceptance, nor in any way affect the continuing rights of Infinity GCS after acceptance of the completed Work.

13.3 Within forty-eight (48) hours after receiving written notice from Infinity GCS that any Work has been rejected by Infinity GCS or the Architect as defective or improper or in any way failing to comply with the Contract Documents, the Subcontractor at its own cost and expense shall take down and remove all portions of such Work from the premises and shall replace the same with proper and satisfactory Work and make good all work of others damaged or destroyed by or as a result of such defective, improper or non-complying Work or by the taking down, removal or replacement thereof.  If Subcontractor fails to correct defective or non-conforming work, in accordance with the terms of this Subcontract, Infinity GCS shall have the right to correct such defective or non-conforming work, and deduct the cost of removing the defective Work and replacing it correctly from the Contract Price.  In the event that Infinity GCS determines in its sole discretion that it is in the best interest of the Project to make payment to the Subcontractor for defective or non-conforming Work, and such payment is accompanied by a statement from Infinity GCS that the Work for which payment is being made is defective and non-conforming, such payment shall not be construed as an acceptance by Infinity GCS of such defective or non-conforming work, and such payment shall not affect the continuing rights of Infinity GCS hereunder.

14.    <u>TERMINATION</u>.





14.1  The occurrence of any of the following events shall be a default by the Subcontractor under this Subcontract, and shall be cause for termination hereof:  (a) failure to supply sufficient skilled workers, equipment, or materials of proper quality and quantity; (b) failure to proceed with the Work in the sequence directed by Infinity GCS; (c) failure to prosecute the Work with promptness and diligence; (d) the stoppage, delay of, or interference with or damage to the work of Infinity GCS or of any other contractors or subcontractors on the Project; (e) failure in the performance of any of the provisions of the Contract Documents; (f) should Infinity GCS determine that the Work or any portion thereof is not being performed in compliance with the Contract Documents; (g) should there be filed by or against the Subcontractor a petition in bankruptcy or for an arrangement or reorganization; (h) should the Subcontractor become insolvent or go into liquidation or dissolution or make a general assignment for the benefit of creditors or otherwise acknowledge insolvency; or (i) Subcontractor's failure to timely pay its subcontractors and/or suppliers.  In any of such events, Infinity GCS shall have the right, in addition to any other rights and remedies provided by the Contract Documents or in law or equity, after forty-eight (48) hours written notice to the Subcontractor mailed or delivered to its last known address, to terminate the employment of the Subcontractor for all or any portion of the Work, as set forth in Article 15 hereof.

14.2 In addition to the right of termination set forth in paragraph 14.1, Infinity GCS shall have the right, without cause and for any reason and at any time, to terminate this Subcontract by delivering not less than five (5) days written notice of such termination to the Subcontractor.  Such termination shall be effective at the time and in the manner specified in said notice and shall be without prejudice to any claims which Infinity GCS may have against the Subcontractor.

14.3 Each subcontract agreement for a portion of the Work is assigned by Infinity GCS to the Owner, provided that assignment is effective only if Infinity GCS is terminated by the Owner for cause and only after such termination, and then only for those subcontract agreements that the Owner accepts by notifying the Subcontractor and Infinity GCS in writing.

15.  <u>REMEDIES UPON TERMINATION</u>.

15.1  Upon the termination of this Subcontract pursuant to paragraph 14.1, Infinity GCS, in addition to any other rights and remedies provided by the Contract Documents, or in law or equity, shall have the right to take possession of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to Infinity GCS, for the purpose of completing the Work, and to employ persons as necessary to complete the Work and to provide all the labor, services, materials, equipment and other items required therefor.  The Subcontractor will be paid only the direct value of its Work completed and materials supplied as of the date of termination, subject to deduction as set forth herein, and Subcontractor shall have no right to anticipated profits or other claimed damages.  The Subcontractor shall not be entitled to receive any further payment under this Subcontract until the Work shall be wholly completed to the satisfaction of Infinity GCS and shall have been accepted by it, at which time, if the unpaid balance of the amount then due under this Subcontract shall exceed the cost incurred by Infinity GCS in completing the Work, such excess shall be paid by Infinity GCS to the Subcontractor, but if such cost shall exceed such unpaid balance, then the Subcontractor shall pay the difference to Infinity GCS.  Such cost of Infinity GCS shall include the cost of completing the Work to the satisfaction of Infinity GCS and of performing and furnishing all labor, services, materials, equipment, and other items required therefor, and also all losses, damages, costs and expense, including legal fees, costs and disbursements incurred by reason of or resulting from the Subcontractor's termination.







15.2 Upon the termination of this Subcontract pursuant to paragraph 14.2, Infinity GCS will pay Subcontractor for the direct value of its Work completed and materials supplied as of the date of termination only, and Subcontractor shall have no right to anticipated profits or other claimed costs, fees, or damages. Should Infinity GCS be terminated by the Owner as described in paragraph 14.3, then Infinity GCS shall only be liable for such amounts it actually receives from the Owner and Subcontractor agrees that its remedy for nonpayment shall be against the Owner and not Infinity GCS.

16.    <u>INSURANCE</u>.

16.1 The Subcontractor shall obtain, maintain and pay for such insurance as may protect the Subcontractor, including its employees, agents and sub-subcontractors against claims for bodily injury or death, or for damage to property, with coverage written on an "occurrence" basis. All insurance shall be issued by an AMBEST rated company (A-, XII or higher) and/or companies acceptable to Infinity GCS. Such insurance shall include, but not be limited to, the following types and coverages:

(a) Commercial General Liability:   $1,000,000.00 Single/$2,000,000.00 General Aggregate

(b) Products/Completed Operations:$1,000,000.00 Single/$2,000,000.00 General Aggregate

(c) Bodily Injury/Property Damage:$1,000,000.00 (including Completed Operations) Per Occurrence

(d) Automobile Liability – Hired and Non-Owner Vehicles: $1,000,000.00 Per Occurrence

(e) Umbrella Excess Liability Coverage:    $1,000,000.00 Per Occurrence

(f) Workers Compensation:         $500,000 Per Occurrence/$1,000,000 Aggregate
    i.    Must include Statutory Requirements (including Blanket Waiver of Subrogation in favor of Infinity GCS.

Infinity GCS does not represent that the above limits and coverages are adequate to protect the Subcontractor's interests and assumes no responsibility therefor. The Subcontractor shall furnish Infinity GCS satisfactory evidence that it has complied with these requirements and shall obtain and furnish to Infinity GCS Certificates of Insurance evidencing the above coverages, which Certificates of Insurance shall name Infinity GCS and Owner as additional insureds (except workers' compensation), and which Certificates of Insurance shall state that such insurance shall not be cancelled except after thirty (30) days written notice to Infinity GCS. An endorsement confirming Infinity GCS' and the Owner's additional insured status shall be issued.

16.2 Infinity GCS shall have the right to require Subcontractor to purchase and maintain property insurance upon the Work, for the full insurable value thereof. Such property insurance shall be with such company or companies as are acceptable to Infinity GCS and shall insure against all risk type coverage.

16.3 To the extent of coverage afforded by any property insurance applicable to the Work or the Project or equipment used in performance of the Work, Infinity GCS and the Subcontractor waive all rights against each other and the subcontractors, agents and employees each of the other, for damages caused by fire or other insured perils, except such rights as they may have to the proceeds of such insurance. The Subcontractor, as appropriate, shall require of its subcontractors and suppliers by appropriate agreements, written where legally required for validity, similar waivers each in favor of all

 

other parties. All insurance policies obtained by Subcontractor shall provide such waivers of subrogation by endorsement or otherwise.

16.4 The Subcontractor shall be solely responsible for and hereby agrees to defend, indemnify, and hold harmless Infinity GCS against claims for losses or damages arising out of uninsured or uninsurable perils or within the deductible of any insurance applicable to the Work of the Subcontractor or those for whom it is responsible.

16.5 Subcontractor expressly agrees that it will ensure that all persons performing Subcontractor's scope of Work, whether employed by Subcontractor or not, will be covered by Subcontractor's workers' compensation insurance or such other workers' compensation insurance so as to ensure that the Contractor remains immune from suit. Should Contractor be forced to pay workers' compensation claims or benefits of any kind to any person performing Subcontractor's scope of Work, Contractor may recover same from Subcontractor.

16.6 The Subcontractor shall require and ensure that Policies issued for its subcontractors shall conform to all the requirements in this Section.

16.7 Insurance Policies and Endorsements shall provide:

(a) Waiver of Subrogation in favor of Contractor and Owner (provide copy of form with COI)
(b) Cross Liability or Severability of Interest Clause (liability policies only)
(c) That Subcontractor's insurance is primary with respect to the interest of Contractor, and that any insurance maintained by Contractor Owner is considered excess and Non-contributory (provide copy of form with COI)
(d) All coverage, including additional insured coverage shall be on an occurrence basis and shall be maintained by Subcontractor during the entire term of the Subcontract and for a minimum of five years after completion of the Work provided for herein (provide copy of form with COI)

16.8 Subcontractor shall provide copies of all policies and proof of all insurance coverage required above, If Subcontractor fails to provide Certificates of Insurance and/or copies of policies for the insurance coverage and endorsements required pursuant to this section, Contractor may, at its option, but shall not be obligated to, purchase insurance of the character nature and limits described above. The amount of the premiums for such coverage paid by the contractor will be withheld from monies due the Subcontractor. All of Subcontractor's insurance policies shall include coverage for Subcontractor's obligations of indemnity.

16.9 The following shall be included as additionally insured on the Certificate of Insurance:

Infinity General Construction Services, Inc
730 N. Atlantic Ave Suite. 204
Ormond Beach, FL 32176

640 North Atlantic Hospitality, LLC
730 N. Atlantic Ave Suite. 102
Ormond Beach, FL 32176





Bank Fifth Third Bank, N.A.,
ISAOA Attn: Construction Loan Administration
8100 Burlington Pike Second Floor – MD 625011
Florence, KY 41042

17. <u>INDEMNITY</u>. To the maximum extent permitted by Florida law, the Subcontractor shall defend, indemnify, and hold harmless Infinity GCS, the Owner, and their agents and employees (the "Indemnitees") from and against any and all liabilities, claims, damages, losses, penalties, demands, judgments, actions proceedings, costs and expenses (including without limitation legal fees, costs and disbursements) arising in whole or in part out of or relating to the Work, including without limitation the failure or alleged failure of the Subcontractor to perform any obligation under this Subcontract, or negligent act or omission of Subcontractor or any willful misconduct of Subcontractor, including such breach, act, omission, or misconduct of the Subcontractor's servants, employees, representatives, agents, or any other persons acting on behalf of Subcontractor, in connection with this Subcontract. The indemnification obligations in this section of the Agreement shall survive the expiration or termination of the Subcontract.

17.1 The Subcontractor agrees to assume entire responsibility and liability for all damages or injury to all persons, whether employees or otherwise, and to all property, arising out of or resulting in whole or in part from or in any manner connected with, the execution of the Work under this Subcontract or occurring or resulting in whole or in part from the use by the Subcontractor, its agents or employees, of materials, equipment, instrumentalities or other property, whether the same be owned by Infinity GCS, the Subcontractor or third parties. To the extent allowed by applicable law, the Subcontractor shall defend, indemnify and hold harmless Infinity GCS, and its agents and employees from all such claims, including without limitation claims for which Infinity GCS may be or may be claimed to be liable in whole or in part, and legal fees, costs and disbursements paid or incurred to defend any such claims or to enforce the provisions of this Article 17. The Subcontractor shall obtain, maintain and pay for such general liability insurance coverage as will insure the indemnity set forth herein, and other contractual indemnities assumed by the Subcontractor in this Subcontract. Subcontractor specifically waives any right to assert any provision of the laws of the State in which the Project is located as a defense to any indemnification obligation arising hereunder.

17.2 The duty to defend under this Article is independent and separate from the duty to indemnify, and the duty to defend exists regardless of any ultimate liability of Subcontractor, Infinity GCS, and any indemnified party. The duty to defend arises immediately upon presentation of a claim by Infinity GCS or the Owner and written notice of such claim being provided to Subcontractor. Subcontractor's obligation to indemnify and defend under this Article will survive the expiration or earlier termination of this Subcontract until it is determined by final judgment that an action against Infinity GCS or the Owner for the matter indemnified hereunder is fully and finally barred by the applicable statute of limitations.

17.3 Upon the assertion by any third party of any claim against the Indemnitees that may give rise to liability of the Subcontractor hereunder, the Indemnitees shall promptly notify the Subcontractor of the existence of such claim and the indemnity claimed. The failure to give timely notice shall not be deemed to be a waiver of the claim to the extent that Subcontractor has not been prejudiced by such failure to give timely notice. If the Subcontractor believes in good faith that there is a valid defense to such claim and a reasonable chance of succeeding thereon and notifies the Indemnitees to that effect, the Indemnitees shall

13

 



give the Subcontractor a reasonable opportunity to defend and settle such claim at its own expense and with counsel mutually selected by the parties. If any such settlement would have a substantially adverse effect on the Indemnitees, the Subcontractor shall not settle such claim without the prior written consent of the Indemnitees, which shall not be unreasonably withheld. The Indemnitees shall at all times have the full right to participate in any such defense at its own expense. Within a reasonable time after receiving notice of a claim from the Indemnitees, if the Subcontractor fails to defend the Indemnitees, then the Indemnitees shall have the right, but not the obligation, to undertake the defense, compromise or settlement of such claim on behalf of, for the account of and at the risk of the Subcontractor.

18.    BONDS  (check one):

       **YES** 1)  Subcontractor shall obtain and furnish to Infinity GCS, and the Infinity GCS's lender, a Payment and Performance Bond in an amount equal to one hundred percent (100%) of the Contract Price, and with a company acceptable to Infinity GCS. The Payment and Performance Bond shall be on a standard AIA form acceptable to Infinity GCS. Subcontractor shall be responsible for complying with any provisions of applicable state law, with respect to notification of any parties providing labor or materials in connection with the work with copies of such bond. The premium for such bond shall be paid by Subcontractor, and such bond shall be delivered by Subcontractor prior to commencement of the Work; or

       _____ 2)  Subcontractor is not required to obtain a bond.

19.  PATENT INFRINGEMENT.  The Subcontractor shall pay all royalties and license fees and shall defend all suits or claims for infringement of any patent rights arising out of the Work of the Subcontractor under this Subcontract.

20.    WARRANTY.  The Subcontractor warrants and guarantees that it is licensed (if construction licensure is required for its scope of Work) and fully qualified to perform the Work and that it shall perform all Work in a skillful manner and shall furnish new materials and equipment of good quality, fit for the purpose intended and free from defects and in compliance with all requirements of the Contract Documents. Subcontractor guarantees the Work to be and remain free of defects in workmanship and materials for a period of one (1) year from the date of completion of the Project as a whole. Without any cost to Infinity GCS, Subcontractor shall promptly correct improper or defective Work, materials or equipment and other work affected by such correction which may be discovered within one (1) year from the date of completion of the Project as a whole by Infinity GCS. With respect to the corrected Work, the one-year correction period shall run from the time of last correction. Without limitation by the foregoing, the Subcontractor shall provide any broader guarantee or such longer guarantee period as required by the other Contract Documents. Required equipment and system warranty documents shall be assigned to Infinity GCS by Subcontractor, and such assignment, together with the warranty documents, shall be delivered to Infinity GCS prior to the application for final payment.

21.  ASSIGNMENT AND SUBLETTING.  Neither this Subcontract nor any monies due or to become due hereunder shall be assignable without the prior written consent of Infinity GCS nor shall the whole or any part of this Subcontract be sublet without like prior written consent. Any such assignment or subletting without prior written consent shall be void and of no effect and shall vest no right or right of action in the assignee or sub-subcontractor against Infinity GCS. Any assignee or sub-subcontractor consented to by Infinity GCS, shall be appropriately licensed to perform the work or services intended,





and shall supply Subcontractor and Infinity GCS with acceptable proof of insurance. Subcontractor shall at all times be responsible for the acts and omissions of its assignees and sub-subcontractors. Infinity GCS's consent to any assignment or subletting shall not relieve the Subcontractor of any of its agreements or obligations under the Contract Documents, and the Subcontractor shall be and remain as fully responsible and liable for the defaults, acts and omissions of its assignees and sub-subcontractors and all persons directly or indirectly employed by them as it is for its own defaults, acts and omissions and those of its own officers, agents, and employees. The Subcontractor shall bind each of its sub-subcontractors to all of the provisions of the Contract Documents with respect to the sublet Work. Infinity GCS's consent to any subletting shall not be deemed to create any contractual relationship between Infinity GCS and any sub-subcontractor to whom the Work or any portion thereof is sublet and shall not vest any right of action in any sub-subcontractor against Infinity GCS.

22.  EQUAL OPPORTUNITY.  The Subcontractor, during the performance of this Subcontract, shall take affirmative action to ensure that all employees and applicants are treated without discrimination with regard to race, color, creed, age, sex or national origin, and Subcontractor shall comply with all applicable federal, state and local laws, ordinances, orders and regulations relating to equal employment opportunity.

23.  GENERAL PROVISIONS.

   23.1 Infinity GCS's waiver of a breach of the provisions of this Subcontract shall be made only in writing and shall not affect any other or future breaches. Infinity GCS's remedies herein are cumulative and in addition to other remedies in law or equity.

   23.2 The headings in front of each Article are for convenience only and are not restrictive.

   23.3 The Subcontractor is an independent contractor for all purposes, and Subcontractor shall at no time during the performance of the Work be deemed to be an employee of Infinity GCS.

   23.4 This Subcontract constitutes the entire agreement between the parties hereto and is effective on the date set forth above. No oral representations or other agreements have been made by Infinity GCS except as stated in this Subcontract. This Subcontractor may not be changed in any way except as herein provided, and no provision hereof may be waived by Infinity GCS except in writing signed by its duly authorized officers or agent.

   23.5 If any legal or equitable action or other proceeding is brought for the enforcement of this Subcontract, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Subcontract, the successful or prevailing party shall be entitled to recover all reasonable attorneys' fees, costs and disbursements, court costs and all expenses incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled, including such fees and costs incurred in determining the reasonable amount of fees and costs to which the prevailing party is entitled.

   23.6 Unless expressly stated herein to the contrary, nothing in this Subcontract, whether express or implied, is intended to confer any rights or remedies under or by reason of this Subcontract on any persons other than the parties hereto.

   23.7 If any provision of this Subcontract is contrary to, prohibited by, or deemed invalid under applicable law, such provision shall be inapplicable and deemed omitted to the extent so contrary,

15





prohibited or invalid, but the remainder hereof shall not be unenforceable or invalidated, and shall be given full force and effect so far as possible.

23.8 This Subcontract shall be governed by the laws of the state in which the Project is located, and any action brought in connection with this Subcontract shall be venued in the county or parish in which the Project is located. Subcontractor and Infinity GCS each mutually, knowingly and willingly waive any right to arbitration to resolve any disputes arising in connection with this Subcontract.

23.9 The undersigned is a duly authorized representative of the Subcontractor and has full power and authority to execute this Subcontract on behalf of the Subcontractor and bind Subcontractor to all of the obligations set forth herein.

23.10 Any notices required by this Subcontract shall be sent by certified mail, return receipt requested to the addresses set forth in the preamble of this Subcontract, or at either party's last known address, and shall be deemed to have been delivered on the date upon which such notice has been deposited in the United States Mail, postage prepaid.

23.11 Wherever any time periods set forth herein are referenced as being measured by "days", such reference shall mean and refer to calendar days, unless otherwise specifically referenced as "business", "working" or "banking" days.

23.12 TO THE EXTENT ALLOWED BY APPLICABLE LAW, INFINITY GCS AND SUBCONTRACTOR EACH HEREBY MUTUALLY, KNOWINGLY, VOLUNTARILY AND WILLINGLY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT IN CONNECTION WITH, OR ARISING OUT OF, THIS SUBCONTRACT.

IN WITNESS WHEREOF, The Subcontractor and INFINITY GCS have executed this Subcontract as set forth below.

Name:_____

Name:_____

Name: _WM. J. Fuller, Jr._

Name:_____

**Infinity GCS**

By:_____ 1/28/2021

Name: _NIMESH PATEL_

Title: _PRESIDENT_

_CRYSTAL HOSPITALITY, LLC_

("Subcontractor"),

By: _Andrew Gercga_ 1/28/2021

Name: _Crystal Hospitality LLC_

Title: _Member._

16

A-6

EXHIBIT "A"

LIST OF PLANS, SPECIFICATIONS, DRAWINGS, GENERAL CONDITIONS,
SPECIAL CONDITIONS AND ADDENDA

**See Attached**

**Plans dated 11-20-18**



EXHIBIT "A"

| Column1 | Column2 | Column4 | Column5 | Column6 | Column7 | Column5 | Column6 |
|---|---|---|---|---|---|---|---|
| | DRAWING INDEX VOLUME 1 | | | | | | |
| SHEET NO | SHEET NAME | PERMIT SET - 06/15/2018 | 60% MARRIOTT COMMENTS - 08/03/2018 | CONSTRUCTION DOCUMENTS - 11/20/2018 | 90% MARRIOTT COMMENTS - 12/13/2019 | PERMIT COMMENTS - 04/09/2020 | PERMIT REVISION - 06/12/2020 |
| **GENERAL** | | | | | | | |
| G0.00 | COVER SHEET | X | X | X | | | X |
| G0.01 | DRAWING INDEX VOLUME 1 | X | X | X | | X | X |
| G0.02 | GENERAL INFORMATION | X | X | X | X | | X |
| **LIFE SAFETY** | | | | | | | |
| LS1.00 | LIFE SAFETY PLAN - LEVEL B1 | X | X | X | | | |
| LS1.01 | LIFE SAFETY PLAN - LEVEL 1 | X | X | X | X | | |
| LS1.02 | LIFE SAFETY PLAN - LEVEL 2 | X | X | X | X | | |
| LS1.03 | LIFE SAFETY PLAN - TYPICAL GUESTROOM LEVELS | X | X | X | X | | |
| **CIVIL** | | | | | | | |
| C1 | COVER SHEET | | | X | X | | |
| C2 | EXISTING SITE CONDITIONS | | | X | X | | |
| C3 | PHASING PLAN | | | X | X | | |
| C4 | DIMENSIONAL PLAN | | | X | X | | |
| C5 | GRADING AND DRAINAGE PLAN | | | X | X | | |
| C6 | UTILITY PLAN | | | X | X | | |
| C7 | GLENVIEW PARKING GARAGE | | | X | X | | |
| C8 | GLENVIEW PARKING GARAGE | | | X | X | | |
| C9 | CONSTRUCTION DETAILS | | | X | X | | |
| C10 | DAYTONA BEACH CITY DETAILS | | | X | X | | |
| C11 | DAYTONA BEACH CITY DETAILS | | | X | X | | |
| C12 | DAYTONA BEACH CITY DETAILS | | | X | X | | |
| C13 | DAYTONA BEACH CITY DETAILS | | | X | X | | |
| C14 | MAINTENANCE OF TRAFFIC PLAN | | | X | X | | |
| LA-2 | LANDSCAPE PLAN (GARAGE) | | | X | | | |
| LA-3 | LANDSCAPE DETAILS (GARAGE) | | | X | | | |
| LA-4 | IRRIGATION PLAN (GARAGE) | | | X | | | |
| LA-5 | IRRIGATION DETAILS (GARAGE) | | | X | | | |
| S-1 | PROPERTY SURVEYS | | | X | | | |
| **DEMOLITION** | | | | | | | |
| D1.00 | SITE DEMOLITION PLAN | X | | X | | | |
| D2.00 | LEVEL B1 DEMOLITION PLAN | X | | X | | | |
| D2.01 | LEVEL 1 DEMOLITION PLAN | X | | X | | | |
| D2.02 | LEVEL 2 DEMOLITION PLAN | X | | X | | | |
| D2.03 | LEVELS 3-11 DEMOLITION PLAN | X | | X | | | |
| D2.04 | ROOF DEMOLITION PLAN | X | | X | | | |
| D8.00 | GUESTROOM DEMOLITION PLANS & RCPS | X | | X | | | |
| **ARCHITECTURE** | | | | | | | |
| A1.00 | ARCHITECTURAL SITE PLAN | X | X | X | X | | |
| A1.01 | COMPOSITE FLOOR PLAN - LEVEL 1 | X | X | X | X | | X |
| A1.02 | COMPOSITE FLOOR PLAN - LEVEL 2 | X | X | X | X | | X |
| A2.00 | FLOOR PLAN / REFLECTED CEILING PLAN - BASEMENT LEVEL | X | X | X | | | |
| A2.01 A1 | FLOOR PLAN - LEVEL 1 - ZONE 'A & C | X | X | X | | | X |
| A2.01 A2 | REFLECTED CEILING PLAN - LEVEL 1 - ZONE 'A & C | X | X | X | X | | X |
| A2.01 B1 | FLOOR PLAN - LEVEL 1 - ZONE 'B | X | X | X | X | | |
| A2.01 B2 | REFLECTED CEILING PLAN - LEVEL 1 - ZONE 'B | X | X | X | X | | X |
| A2.02 A1 | FLOOR PLAN - LEVEL 2 - ZONE 'A & C | X | X | X | X | | X |
| A2.02 A2 | REFLECTED CEILING PLAN - LEVEL 2 - ZONE 'A | X | X | X | X | | X |
| A2.02 B1 | FLOOR PLAN - LEVEL 2 - ZONE 'B | X | X | X | X | | |
| A2.02 B2 | REFLECTED CEILING PLAN - LEVEL 2 - ZONE 'B | X | X | X | | | X |
| A2.02 B3 | ROOF PLAN - ZONE'B' | X | X | X | | | |
| A2.03 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 3 | X | X | X | | | X |
| A2.04 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 4 | X | X | X | X | | |
| A2.05 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 5 | X | X | X | | | |
| A2.06 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 6 | X | X | X | | | X |
| A2.07 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 7 | X | X | X | X | | X |
| A2.08 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 8 | X | X | X | X | | X |
| A2.09 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 9 | X | X | X | X | | X |
| A2.10 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 10 | X | X | X | X | | |
| A2.11 | FLOOR PLAN / REFLECTED CEILING PLAN - LEVEL 11 | X | X | X | X | | |
| A2.12 | ROOF PLAN | X | X | X | X | | X |
| A4.01 | WEST ELEVATION - (A1A VIEW) | X | X | X | X | | X |
| A4.02 | SOUTH ELEVATION - (HOTEL) | X | X | X | X | | X |
| A4.03 | EAST ELEVATION - (OCEAN VIEW) | X | X | X | X | | X |
| A4.04 | NORTH ELEVATION - (GLENVIEW) | X | X | X | X | | X |
| A4.05 | COMPONENT - BALLROOM WEST | X | X | X | X | | X |
| A4.06 | ELEVATION DIAGRAMS | X | X | X | X | | X |
| A5.01 | HOTEL TOWER & PORTE COCHERE - BUILDING SECTION WEST / EAST | X | X | X | X | | X |
| A5.02 | HOTEL TOWER & BALLROOM - BUILDING SECTION NORTH/SOUTH | X | X | X | X | | X |
| A5.03 | HOTEL TOWER - BUILDING SECTION NORTH/SOUTH | X | X | X | X | | |
| A5.11 | BALLROOM ENLARGED SECTIONS | X | X | X | | | |
| A5.12 | BALLROOM ENLARGED SECTIONS | X | X | X | | | |
| A5.13 | BALLROOM ENLARGED SECTIONS | X | X | X | | | |
| A5.14 | HOTEL TOWER ENLARGED SECTIONS | X | X | X | X | | |
| A6.01 | PLAN DETAILS | X | X | X | | | |
| A6.02 | PLAN DETAILS | X | X | X | | | X |
| A6.11 | SECTION DETAILS | X | X | X | | | X |

A6. Ⓜ

EXHIBIT "A"

| Sheet | Title | | | | | |
|---|---|---|---|---|---|---|
| A6.12 | SECTION DETAILS | X | X | X | | X |
| A6.13 | SECTION DETAILS | X | X | X | | X |
| A6.14 | SECTION DETAILS | X | X | X | | X |
| A6.15 | SECTION DETAILS | X | X | X | | X |
| A7.01 | STAIR 1 & 2 PLANS & SECTIONS | X | X | X | X | X |
| A7.02 | STAIRS 3 & 4 PLANS & SECTIONS | X | X | X | | X |
| A7.03 | STAIRS 5 & 6 PLANS & SECTIONS | X | X | X | | X |
| A7.04 | STAIR & RAMP PLANS & SECTIONS | X | X | X | | X |
| A7.05 | RAMPS ENLARGED PLANS & SECTIONS | X | X | X | | |
| A7.06 | STAIR DETAILS | X | X | X | | |
| A7.10 | ELEVATOR PLAN & SECTIONS - HOTEL TOWER | X | X | X | | |
| A7.11 | ELEVATOR PLAN & SECTIONS - LOBBY ELEVATOR | X | X | X | | |
| A8.01 | ENLARGED GUESTROOM PLANS - K+ | X | X | X | | |
| A8.02 | ENLARGED GUESTROOM PLANS - QQ | X | X | X | | X |
| A8.03 | ENLARGED GUESTROOM PLANS - K | X | X | X | | |
| A8.04 | ENLARGED GUESTROOM PLANS - 1BDRM | X | X | X | | X |
| A8.05 | ENLARGED GUESTROOMS PLANS - QQ+ | X | X | X | | |
| A8.06 | ENLARGED GUESTROOM PLANS - HOSPITALITY SUITE | | | X | | |
| A8.10 | TUB DETAILS | X | X | X | | |
| A8.11 | SHOWER DETAILS | X | X | X | | |
| A8.12 | ROLL-IN SHOWER DETAILS | X | X | X | | |
| A8.13 | MOUNTING HEIGHTS & PLUMBING FIXTURES | X | X | X | | |
| A8.20 | ENLARGED RESTROOM FLOOR PLANS AND RCPS | X | X | X | X | |
| A8.21 | ENLARGED PLANS - ELECTRICAL, ICE, IDF ROOMS | X | X | X | | |
| A8.22 | ENLARGED PLANS & INTERIOR ELEVATIONS - BREAK ROOM, LOCKER ROOM | X | X | X | | X |
| A9.01 | INTERIOR PARTITIONS | X | X | X | | |
| A9.02 | INTERIOR PARTITIONS | X | X | X | | |
| A9.03 | INTERIOR PARTITIONS | X | X | X | | |
| A9.04 | INTERIOR PARTITIONS (CMU) | X | X | X | | |
| A9.10 | DOOR SCHEDULE AND TYPES | X | X | X | X | |
| A9.12 | DOOR DETAILS (CMU & STEEL STUD PARTITIONS) | X | X | X | | X |
| A9.13 | SPECIAL DOOR DETAILS & SILL DETAILS | X | X | X | | |
| A9.21 | WINDOW TYPES | X | X | X | X | |
| A9.22 | WINDOW TYPES | X | X | X | | X |
| A9.23 | WINDOW TYPES | X | X | X | | X |
| A9.24 | ARCHITECTURAL SCREEN TYPES | X | X | X | X | |
| A9.25 | ARCHITECTURAL SCREEN TYPES | | | X | | X |
| | | | | | | |
| LANDSCAPE | | | | | | |
| MP-00 | MASTER PLAN | | | X | X | |
| GR-00 | GRADING NOTES | X | X | X | X | |
| GR-01 | GRADING PLAN | X | X | X | X | |
| LY-01 | LAYOUT PLAN | X | X | X | X | |
| HS-00 | HARDSCAPE NOTES | X | X | X | X | |
| HS-01 | HARDSCAPE PLAN | X | X | X | X | |
| HD-01 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-02 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-03 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-04 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-05 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-06 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-07 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-08 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-09 | HARDSCAPE DETAILS | X | X | X | X | |
| HD-10 | WATER FEATURE FINISHES | X | X | X | X | |
| HD-11 | HARDSCAPE DETAILS | X | X | X | X | |
| LSN-00 | LANDSCAPE NOTES | | | X | X | |
| LST-01 | TREE PLAN | | | X | X | |
| LSS-01 | SHRUB PLAN | | | X | X | |
| LSD-01 | LANDSCAPE DETAILS | | | X | X | |
| IR-00 | IRRIGATION NOTES | X | X | X | X | |
| IR-01 | IRRIGATION PLAN | X | X | X | X | |
| IR-02 | IRRIGATION DETAILS | X | X | X | X | |
| SF-01 | SITE FURNISHINGS PLAN | X | X | X | X | |
| SF-02 | SITE FURNISHINGS CUTSHEETS | | | X | X | |
| LI-00 | LIGHTING NOTES | X | X | X | X | |
| LI-01 | LIGHTING PLAN | X | X | X | X | |
| LI-02 | LIGHTING PHOTOMETRIC | X | X | X | X | |
| LI-03 | LIGHTING CUT SHEETS | X | X | X | X | |
| LI-04 | LIGHTING CUT SHEETS | | | | X | |
| MEP-01 | ELECTRICAL PLAN | X | X | X | X | |
| ST-00 | STRUCTURAL NOTES | | | X | X | |
| ST-01 | STRUCTURAL DETAILS | | | X | X | |
| ST-02 | STRUCTURAL DETAILS | | | X | X | |
| ST-03 | STRUCTURAL DETAILS | | | X | X | |
| ST-04 | STRUCTURAL DETAILS | | | X | X | |
| ST-05 | STRUCTURAL DETAILS | | | X | X | |
| ST-06 | STRUCTURAL DETAILS | | | X | X | |
| ST-07 | STRUCTURAL DETAILS | | | X | X | |
| ST-08 | STRUCTURAL DETAILS | | | X | X | |
| ST-09 | STRUCTURAL DETAILS | | | X | X | |
| ST-10 | STRUCTURAL DETAILS | | | X | X | |
| LI-01.1 | LIGHTING - FC LEVELS PLAN | X | X | | | |
| LS-00 | GENERAL LANDSCAPE NOTES | X | X | | | |
| LS-01 | LANDSCAPE PLAN | | | | | |
| LS-01.1 | LANDSCAPE PLAN - TREES | X | X | | | |
| LS-01.2 | LANDSCAPE PLAN - SHRUBS & GROUND COVER | X | X | | | |

A-6

EXHIBIT A

| Code | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| LS-02 | LANDSCAPE DETAILS | X | X | | | | |
| LY-00 | LAYOUT NOTES | X | X | | | | |
| PL0.00 | COVER PAGE | X | X | | | | |
| PL0.20 | PARTIAL SITE PLAN | X | X | | | | |
| PL1.00 | POOL DATA BLOCK, ID & DIMENSIONS | X | X | | | | |
| PL1.30 | POOL - EQUIPMENT ROOM - BOM, ID, NOTES & DIMENSIONS | X | X | | | | |
| PL2.00 | WATERFALL FOUNTAIN DATA BLOCK, BOM, ID, DIMS & SECTION | X | X | | | | |
| PL2.30 | FOUNTAIN - EQUIPMENT ROOM - BOM, ID & NOTES | X | X | | | | |
| | | | | | | | |
| **STRUCTURE** | | | | | | | |
| S1.00 | GENERAL NOTES | X | X | X | | | |
| S1.01 | GENERAL SCHEDULES | X | X | X | | | X |
| S1.10 | REQUIRED INSPECTIONS & TESTING | | | X | | | |
| S1.11 | REQUIRED INSPECTIONS & TESTING | | | X | | | |
| S2.00 | FOUNDATION PLAN - LEVEL B1 | | | X | | | |
| S2.01 A | FOUNDATION PLAN - LEVEL 1 - ZONE A | X | X | X | | | |
| S2.01 B | FOUNDATION PLAN - LEVEL 1 - ZONE B | X | X | X | X | | |
| S2.02 A | FRAMING PLAN - LEVEL 2 - ZONE A | X | X | X | | X | X |
| S2.02 B | FRAMING PLAN - LEVEL 2 - ZONE B | X | X | X | X | | X |
| S2.03 A | FRAMING & ROOF PLAN - LEVEL 3 - ZONE A | X | X | X | | | X |
| S2.03 B | ROOF FRAMING PLAN - LEVEL 3 - ZONE B | X | X | X | | | X |
| S2.04 | FRAMING PLAN - LEVELS 4 THRU 11 | X | X | X | | | X |
| S2.12 | ROOF FRAMING PLAN | X | X | X | X | | X |
| S3.01 | FOUNDATION SECTIONS & DETAILS | X | X | X | | | X |
| S3.02 | FOUNDATION SECTIONS & DETAILS | X | X | X | | | X |
| S3.03 | FOUNDATION SECTIONS & DETAILS | X | X | X | | | |
| S4.01 | FRAMING SECTIONS & DETAILS | X | X | X | | | X |
| S4.02 | FRAMING SECTIONS & DETAILS | X | X | X | | X | X |
| S4.03 | FRAMING SECTIONS & DETAILS | X | X | X | | | X |
| S5.01 | ROOF FRAMING SECTIONS & DETAILS | X | X | X | | | |
| S5.02 | ROOF FRAMING SECTIONS & DETAILS | X | X | X | | | X |
| S6.01 | TOWER FOUNDATIONS SECTIONS & DETAILS | X | X | X | | | X |
| S6.02 | TOWER ADDED BRACE SECTIONS & DETAILS | X | X | X | | | X |
| S6.03 | TOWER FRAMING SECTIONS & DETAILS | X | X | X | | | X |
| S6.04 | TOWER FRAMING SECTIONS & DETAILS | X | X | X | | | |
| S6.05 | TOWER ROOF FRAMING SECTIONS & DETAILS | X | X | X | | | X |
| S7.01 | CONCRETE REPAIR DETAILS | | | X | X | | X |
| | | | | X | | | X |
| | | | | | | | |
| **MECHANICAL** | | | | | | | |
| M2.00 | FLOOR PLAN - LEVEL B1 - MECHANICAL | X | X | X | | | • |
| M2.01A | FLOOR PLAN - LEVEL 1 ZONE A - MECHANICAL | X | X | X | | | |
| M2.01B | FLOOR PLAN - LEVEL 1 ZONE B - MECHANICAL | X | X | X | X | | |
| M2.02A | LEVEL 2 FLOOR PLAN A - MECHANICAL | X | X | X | | | X |
| M2.02B | LEVEL 2 FLOOR PLAN B - MECHANICAL | X | X | X | X | | |
| M2.03A | LEVEL 3 FLOOR PLAN A - MECHANICAL | X | X | X | | | X |
| M2.03B | LEVEL 3 ROOF PLAN B - MECHANICAL | X | X | X | | | |
| M2.04 | LEVEL 4 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.05 | LEVEL 5 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.06 | LEVEL 6 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.07 | LEVEL 7 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.08 | LEVEL 8 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.09 | LEVEL 9 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.10 | LEVEL 10 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.11 | LEVEL 11 FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M2.12 | ROOF PLAN - MECHANICAL | X | X | X | | | |
| M3.00 | PIPING FLOOR PLAN - LEVEL B1 MECHANICAL | X | X | X | | | X |
| M3.01A | PIPING FLOOR PLAN - LEVEL 1 ZONE A - MECHANICAL | X | X | X | | | |
| M3.01B | PIPING FLOOR PLAN - LEVEL 1 ZONE B - MECHANICAL | X | X | X | | | |
| M3.02A | LEVEL 2 PIPING FLOOR PLAN A - MECHANICAL | X | X | X | | | |
| M3.02B | LEVEL 2 PIPING FLOOR PLAN B - MECHANICAL | X | X | X | X | | |
| M3.03A | LEVEL 3 PIPING FLOOR PLAN A - MECHANICAL | X | X | X | | | |
| M3.03B | LEVEL 3 PIPING ROOF PLAN B - MECHANICAL | X | X | X | | | |
| M3.04 | LEVEL 4 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.05 | LEVEL 5 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.06 | LEVEL 6 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.07 | LEVEL 7 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.08 | LEVEL 8 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.09 | LEVEL 9 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.10 | LEVEL 10 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.11 | LEVEL 11 PIPING FLOOR PLAN - MECHANICAL | X | X | X | | | |
| M3.12 | ROOF PLAN - MECHANICAL | X | X | X | | | |
| M4.01 | KITCHEN PART PLAN - MECHANICAL | X | X | X | X | | |
| M5.01 | RISER DIAGRAMS MECHANICAL | X | X | X | | | |
| M5.02 | RISER DIAGRAMS MECHANICAL | X | X | X | X | | |
| M5.03 | RISER DIAGRAMS MECHANICAL | X | X | X | | | |
| M5.04 | RISER DIAGRAMS MECHANICAL | X | X | X | | | |
| M5.05 | RISER DIAGRAMS MECHANICAL | X | X | X | | | |
| M7.01 | GENERAL NOTES MECHANICAL | X | X | X | | | |
| M7.02 | DETAILS MECHANICAL | X | X | X | | | |
| M7.03 | DETAILS MECHANICAL | X | X | X | | | |
| M7.04 | UL DETAILS MECHANICAL | X | X | X | | | |
| M7.05 | SCHEDULES MECHANICAL | X | X | X | | | |
| | | | | | | | X |
| | | | | | | | |
| **ELECTRICAL** | | | | | | | |
| E0.00 | ELECTRICAL LEGEND & NOTES | X | X | X | X | | |
| E2.00 | FLOOR PLAN - LEVEL B1 - ELECTRICAL | X | X | X | X | | |
| E2.00.1 | FLOOR PLAN - LEVEL B1 - ELECTRICAL HVAC CONNECTIONS | X | X | X | X | | X |

HG Ⓜ

| Sheet | Title | | | | | |
|---|---|---|---|---|---|---|
| E2.01.A | FLOOR PLAN - LEVEL 1 ZONE A - ELECTRICAL | X | X | X | X | |
| E2.01.A.1 | FLOOR PLAN - LEVEL 1 ZONE A - ELECTRICAL HVAC CONNECTIONS | X | X | X | X | X |
| E2.01.B | FLOOR PLAN - LEVEL 1 ZONE B - ELECTRICAL | X | X | X | X | X |
| E2.02.A | FLOOR PLAN - LEVEL 2 ZONE A - ELECTRICAL | X | X | X | X | X |
| E2.02.B | FLOOR PLAN - LEVEL 2 ZONE B - ELECTRICAL | X | X | X | | |
| E2.03.A | FLOOR PLAN - LEVEL 3 ZONE A - ELECTRICAL | X | X | X | | |
| E2.03.B | FLOOR PLAN - LEVEL 3 ZONE B - ELECTRICAL | X | X | X | | |
| E2.04 | FLOOR PLAN - LEVEL 4 - ELECTRICAL | X | X | X | | X |
| E2.05 | FLOOR PLAN - LEVEL 5 ELECTRICAL | X | X | X | | |
| E2.06 | FLOOR PLAN - LEVEL 6 ELECTRICAL | X | X | X | | X |
| E2.07 | FLOOR PLAN - LEVEL 7 ELECTRICAL | X | X | X | | X |
| E2.08 | FLOOR PLAN - LEVEL 8 ELECTRICAL | X | X | X | | X |
| E2.09 | FLOOR PLAN - LEVEL 9 ELECTRICAL | X | X | X | | X |
| E2.10 | FLOOR PLAN - LEVEL 10 ELECTRICAL | X | X | X | | X |
| E2.11 | FLOOR PLAN - LEVEL 11 - ELECTRICAL | X | X | X | | X |
| E2.12 | ROOF PLAN - ELECTRICAL | X | X | X | | X |
| E3.01 | FOOD SERVICE PART PLANS - LEVEL 1 - ELECTRICAL | X | X | X | | X |
| E3.02 | BANQUET KITCHEN FOOD SERVICE PART PLAN - LEVEL 2 - ELECTRICAL | X | X | X | X | X |
| E4.01 | GUESTROOM PLANS - ELECTRICAL | X | X | X | | X |
| E4.02 | GUESTROOM PLANS - ELECTRICAL | X | X | X | | |
| E5.01 | ELECTRICAL RISER DIAGRAM | X | X | X | | |
| E5.02 | ELECTRICAL RISER DIAGRAM | X | X | X | | |
| E5.03 | DIMMING EQUIPMENT RISER DIAGRAM AND SCHEDULES | X | X | X | | X |
| E6.01 | PANELBOARD SCHEDULES | X | X | X | | |
| E6.02 | PANELBOARD SCHEDULES | X | X | X | X | X |
| E6.03 | PANELBOARD SCHEDULES | X | X | X | | X |
| E10.00 | LIGHT FIXTURE SCHEDULES & COMCHECK | X | X | X | | |
| EL2.00 | FLOOR PLAN - LEVEL B1 - LIGHTING | X | X | X | | X |
| EL2.01.A | FLOOR PLAN - LEVEL 1 ZONE A - LIGHTING | X | X | X | | X |
| EL2.01.B | FLOOR PLAN - LEVEL 1 ZONE B - LIGHTING | X | X | X | X | X |
| EL2.02.A | FLOOR PLAN - LEVEL 2 ZONE A - LIGHTING | X | X | X | X | X |
| EL2.02.B | FLOOR PLAN - LEVEL 2 ZONE B - LIGHTING | X | X | X | | X |
| EL2.03.A | FLOOR PLAN - LEVEL 3 ZONE A - LIGHTING | X | X | X | | X |
| EL2.04 | FLOOR PLAN - LEVEL 4 - LIGHTING | X | X | X | | |
| EL2.05 | FLOOR PLAN - LEVEL 5 - LIGHTING | X | X | X | | |
| EL2.06 | FLOOR PLAN - LEVEL 6 - LIGHTING | X | X | X | | |
| EL2.07 | FLOOR PLAN - LEVEL 7 - LIGHTING | X | X | X | | |
| EL2.08 | FLOOR PLAN - LEVEL 8 - LIGHTING | X | X | X | | |
| EL2.09 | FLOOR PLAN - LEVEL 9 - LIGHTING | X | X | X | | |
| EL2.10 | FLOOR PLAN - LEVEL 10 - LIGHTING | X | X | X | | |
| EL2.11 | FLOOR PLAN - LEVEL 11 - LIGHTING | X | X | X | | |

**PLUMBING**

| Sheet | Title | | | | | |
|---|---|---|---|---|---|---|
| P2.00 | FLOOR PLAN - (LEVEL B1) - PLUMBING | X | X | X | | |
| P2.01A | FLOOR PLAN - LEVEL 1 - ZONE A - PLUMBING | X | X | X | | |
| P2.01B | FLOOR PLAN - LEVEL 1 - ZONE B - PLUMBING | X | X | X | X | |
| P2.02A | FLOOR PLAN - LEVEL 2 - ZONE A - PLUMBING | X | X | X | X | X |
| P2.02B | FLOOR PLAN - LEVEL 2 - ZONE B - PLUMBING | X | X | X | X | |
| P2.03A | FLOOR PLAN LEVELS 3 PLAN A - PLUMBING | X | X | X | | |
| P2.03B | LEVEL 3 ROOF PLAN B - PLUMBING | X | X | X | | |
| P2.04 | LEVEL 4 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.05 | LEVEL 5 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.06 | LEVEL 6 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.07 | LEVEL 7 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.08 | LEVEL 8 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.09 | LEVEL 9 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.10 | LEVEL 10 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.11 | LEVEL 11 FLOOR PLAN - PLUMBING | X | X | X | | |
| P2.12 | ROOF PLAN - PLUMBING | X | X | X | | |
| P4.01 | GUEST ROOM BATH PLANS - SOVENT | X | X | X | | |
| P4.02 | GUEST ROOM PLANS - DOMESTIC WATER | X | X | X | | |
| P4.03 | KITCHEN & RESTAURANT PLUMBING - SAN & VENT | X | X | X | X | |
| P4.04 | KITCHEN & RESTAURANT PLUMBING - DOMESTIC WATER | X | X | X | X | |
| P4.05 | PUBLIC AREA RESTROOMS - SAN & VENT | X | X | X | X | |
| P4.06 | PUBLIC AREA RESTROOMS - DOMESTIC WATER | X | X | X | X | X |
| P4.07 | BASEMENT PART PLANS - PLUMBING | X | X | X | X | X |
| P5.01 | GUESTROOM SOVENT RISER DIAGRAMS | X | X | X | | |
| P5.02 | GUESTROOM SOVENT RISER DIAGRAMS | X | X | X | | |
| P5.03 | GUESTROOM SOVENT RISER DIAGRAMS | X | X | X | | |
| P5.04 | GUESTROOM SOVENT RISER DIAGRAMS | X | X | X | | |
| P5.05 | GUESTROOM SOVENT & WASTE RISER DIAGRAMS | X | X | X | | |
| P5.06 | GUESTROOM SOVENT & WASTE RISER DIAGRAMS | X | X | X | | |
| P5.07 | GUESTROOM DOMESTIC WATER RISER DIAGRAM | X | X | X | | |
| P7.01 | GENERAL NOTES, SCHEDULES & DETAILS PLUMBING | X | X | X | | |
| P7.02 | DETAILS - PLUMBING | X | X | X | | |
| P7.03 | DETAILS - PLUMBING | X | X | X | X | X |
| P7.04 | UL DETAILS MECHANICAL | X | X | X | | |
| P7.05 | SOVENT DETAILS | | | X | | |

**INTERIOR DESIGN**

| Sheet | Title | | | | | |
|---|---|---|---|---|---|---|
| ID0.00 | COVER SHEET | X | X | X | X | |
| ID0.01 | INDEX | X | X | X | X | |
| ID1.00 | LEVEL 1 CONSTRUCTION PLAN | X | X | X | X | |
| ID1.01 | LEVEL 1 REFLECTED CEILING PLAN | X | X | X | X | |
| ID1.02 | LEVEL 1 - FURNITURE PLAN | X | X | X | X | |
| ID1.03 | LEVEL 2 - CONSTRUCTION PLAN | X | X | X | X | |
| ID1.04 | LEVEL 2 - REFLECTED CEILING PLAN | X | X | X | X | |

EXHIBIT "A"

| No. | Description | | | | |
|---|---|---|---|---|---|
| ID1.05 | LEVEL 2 FURNITURE PLAN | | X | X | X |
| ID1.06 | TYPICAL GUESTROOM CONSTRUCTION AND FURNITURE PLAN | X | X | X | X |
| ID1.07 | TYPICAL GUESTROOM REFLECTED CEILING PLAN | X | X | X | X |
| ID2.00 | LEVEL 1 - MAIN ENTRY AND RECEPTION AREA | X | X | X | X |
| ID2.01 | LEVEL 1 - TRANSITION TO RESTAURANT | X | X | X | X |
| ID2.02 | LEVEL 1 - MENS AND WOMENS RESTROOMS | X | X | X | X |
| ID2 03 | LEVEL 1 - LOBBY LOUNGE & ELEVATOR VESTIBULE | X | X | X | X |
| ID2 04 | LEVEL 1 - FITNESS CENTER | X | X | X | X |
| ID2 05 | LEVEL 1 - UNISEX RESTROOMS | X | X | X | X |
| ID2 06 | LEVEL 1 - POOL RESTROOMS | X | X | X | X |
| ID2 07 | LEVEL 1 - OFFICES | X | | | |
| ID2 08 | LEVEL 1 - RESTAURANT | | X | X | X |
| ID2 09 | LEVEL 1 - RESTAURANT | | X | X | X |
| ID2 10 | LEVEL 2 - PREFUNCTION ELEVATIONS | | X | X | X |
| ID2 11 | LEVEL 2 - BALLROOM ELEVATIONS | | X | X | X |
| ID2 11B | LEVEL 2 - BALLROOM ELEVATIONS CONT'D | X | X | X | X |
| ID2 12 | LEVEL 2 - MEETING ROOMS | X | X | X | X |
| ID2 13 | LEVEL 2 - RESTROOMS | | | X | X |
| ID2 14 | TYPE F - KING ROOM & HOSPITALITY SUITE | | | X | X |
| ID2 15 | TYPE F - KING ROOM & HOSPITALITY SUITE - CONT'D | | | X | X |
| ID2 16 | TYPE A - TYPICAL KING ROOM | X | X | X | X |
| ID2 17 | TYPE AA 1 - CONNECTING KING ROOM | X | X | X | X |
| ID2 18 | TYPE AA 2 - CONNECTING KING ROOM | X | X | X | X |
| ID2 19 | TYPE B - TYPICAL DOUBLE ROOM | X | X | X | X |
| ID2 20 | TYPE BB - CONNECTING DOUBLE ROOM | X | X | X | X |
| ID2 21 | TYPE C - KING SUITE | X | X | X | X |
| ID2 22 | TYPE D - ONE BEDROOM | X | X | X | X |
| ID2 23 | TYPE E - DOUBLE SUITE | X | X | X | X |
| ID2 24A | CORRIDOR CONSTRUCTION PLAN AND RCP | X | X | X | X |
| ID2 24B | TYPICAL CORRIDOR ELEVATIONS | X | X | X | X |
| ID2 25 | ADA ROOM W/ ROLL IN SHOWER - TYPE AA 1 | X | X | X | X |
| ID2 26 | ADA ROOM W/ ROLL IN SHOWER - TYPE C - KING SUITE | X | X | X | X |
| ID2 27 | ADA ROOM W/ TUB - TYPE D - ONE BEDROOM | X | X | X | X |
| ID2 28 | ADA ROOM W/ TUB - TYPE E - DOUBLE SUITE | X | X | X | X |
| ID2 29 | ADA ROOM TYPE A - TYPICAL KING ROOM | | | X | X |
| ID3 00 | ENLARGED PLANS - RESTROOMS | X | X | X | X |
| ID3 01 | ENLARGED PLANS - LEVEL 2 RESTROOMS & MEETING ROOMS | | | X | X |
| ID4 00 | FLOORING/ WALL DETAILS AND CEILING DETAILS | | | X | X |
| ID5 00 | SCHEDULES | X | X | X | X |
| ID5 01 | SCHEDULES | | | X | X |
| | | | | | |
| **FOOD SERVICE** | | | | | |
| FS-1 | FOOD SERVICE EQUIPMENT PLAN LEVEL 1 | X | X | X | |
| FS-1UL | FOOD SERVICE EQUIPMENT UTILITY LOAD SCHEDULE | X | X | X | |
| L-1 | LAUNDRY EQUIPMENT PLAN BASEMENT LEVEL | X | X | X | |
| L-1E | LAUNDRY ELECTRICAL SPOT CONNECTION PLAN | X | X | X | |
| L-1M | LAUNDRY MECHENICAL SPOT CONNECTION PLAN | X | X | X | |
| L-1SC | LAUNDRY SPECIAL CONDITIONS PLAN | X | X | X | |
| L-1UL | LAUNDRY EQUIPMENT UTILITY LOAD SCHEDULE | X | X | X | |
| | | | | | |
| **DATA-VOICE** | | | | | |
| DV0 00 | COVER SHEET - SPECIAL SYSTEMS | X | X | X | |
| DV0 01 | SYMBOLS AND LEGEND SHEET - SPECIAL SYSTEMS | X | X | X | |
| DV1 00 | SITE PLAN - SPECIAL SYSTEMS | X | X | X | |
| DV1 01 | LEVEL 1 - SPECIAL SYSTEMS | X | X | X | |
| DV1 02 | LEVEL 2 - SPECIAL SYSTEMS | X | X | X | |
| DV1 03 | LEVEL 3-11 - SPECIAL SYSTEMS | X | X | X | X |
| DV1 04 | ROOF LEVELS - SPECIAL SYSTEMS | X | X | X | X |
| DV4 00 | TYP GUESTROOM LAYOUTS - SPECIAL SYSTEMS | X | X | X | |
| DV9 00 | EQUIPMENT ROOM LAYOUT - SPECIAL SYSTEMS | X | X | X | |
| DV9 01 | DATA/VOICE CONDUIT RISER DIAGRAM - SPECIAL SYSTEMS | X | X | X | |
| DV9 02 | CONDUIT AND GROUNDING RISER DIAGRAM - SPECIAL SYSTEMS | X | X | X | |
| DV9 06 | INSTALLATION DETAILS - SPECIAL SYSTEMS | X | X | X | |
| DV9 07 | CCTV RISER DETAILS - SPECIAL SYSTEMS | X | X | X | |
| DV9 08 | DAS/ CELLULAR SYSTEM RISER DIAGRAM - SPECIAL SYSTEMS | X | X | X | |
| DV9 09 | FIRST RESPONDERS RADIO AMP DIAGRAM - SPECIAL SYSTEMS | X | X | X | |
| | | | | | |
| **AUDIO/ VISUAL** | | | | | |
| AV0 00 | COVER SHEET - AV SYSTEMS | X | X | X | |
| AV0 01 | LEGEND SHEET - AV SYSTEMS | X | X | X | |
| AV2 01 | COMPOSITE FLOOR PLAN - LEVEL 1 | X | X | X | |
| AV2 02 | COMPOSITE FLOOR PLAN - LEVEL 2 | X | X | X | |
| AV8 00 | EQUIPMENT ROOM LAYOUR REFERENCE SHEET - AV SYSTEMS | X | X | X | X |
| AV8 01 | EQUIPMENT AND CONNECTIVITY SHEET A - AV SYSTEMS | X | X | X | |
| AV8 02 | EQUIPMENT AND CONNECTIVITY SHEET B - AV SYSTEMS | X | X | X | |
| AV8 03 | EQUIPMENT AND CONNECTIVITY SHEET C - AV SYSTEMS | X | X | X | |
| AV9 01 | DETAIL SHEET - AV SYSTEMS | X | X | X | X |



A.6.

| Column1 | Column2 | Column3 | Column4 | Column5 | Column6 |
|---|---|---|---|---|---|
| **Volume One** | | | | | **Issue Date** |
| | | | | | |
| **Division 00** | | | | | |
| | | | | | |
| 003132 Geotechnical Data | | | | | 11/20/2018 |
| Addendum No. 1 | | | | | 12/13/2019 |
| Addendum No. 2 | | | | | 6/19/2020 |
| | | | | | |
| **Division 01** | | | | | |
| | | | | | |
| 011000 Summary | | | | | 11/20/2018 |
| 012600 Contract Modification Procedures | | | | | 11/20/2018 |
| 012613 Request for Information Procedures | | | | | 11/20/2018 |
| 012900 Payment Procedures | | | | | 11/20/2018 |
| 012978 Interim Contractor's Affidavit and Waiver of Liens | | | | | 11/20/2018 |
| 012979 Final Contractor's Affidavit and Waiver of Liens | | | | | 11/20/2018 |
| 013113 Project Coordination | | | | | 11/20/2018 |
| 013119 Project Meetings | | | | | 11/20/2018 |
| 013200 Construction Progress Documentation | | | | | 11/20/2018 |
| 013300 Submittal Procedures | | | | | 11/20/2018 |
| 014150 Threshold Inspections | | | | | 11/20/2018 |
| 014200 References | | | | | 11/20/2018 |
| 014500 Quality Control | | | | | 11/20/2018 |
| 014523 Inspecting and Testing Services | | | | | 11/20/2018 |
| 015000 Temporary Facilities and Controls | | | | | 11/20/2018 |
| 015800 Temporary Project Identification | | | | | 11/20/2018 |
| 016000 Product Requirements | | | | | 11/20/2018 |
| 017123 Field Engineering | | | | | 11/20/2018 |
| 017329 Cutting and Patching | | | | | 11/20/2018 |
| 017419 Construction Waste Management and Disposal | | | | | 11/20/2018 |
| 017700 Closeout Procedures | | | | | 11/20/2018 |
| | | | | | |
| **Division 2** | | | | | |
| | | | | | |
| 024116 Structure Demolition | | | | | 11/20/2018 |
| 024119 Selective Demolition | | | | | 11/20/2018 |
| | | | | | |
| **Division 03 - Concrete** | | | | | |
| | | | | | |
| 033000 Cast-In-Place Concrete | | | | | 11/20/2018 |
| | | | | | |
| **Division 04 - Masonry** | | | | | |
| | | | | | |
| 042200 Concrete Unit Masonry | | | | | 11/20/2018 |
| | | | | | |
| **Division 05 - Metals** | | | | | |





| | | | | |
|---|---|---|---|---|
| 051200 Structural Steel | | | | 11/20/2018 |
| 052100 Steel Joists / Girders | | | | 11/20/2018 |
| 053100 Steel Deck | | | | 11/20/2018 |
| 054000 Cold-Formed Steel Framing | | | | 11/20/2018 |
| 055000 Metal Fabrications | | | | 11/20/2018 |
| 055100 Metal Stairs | | | | 11/20/2018 |
| 055213 Pipe and Tube Railings | | | | 11/20/2018 |
| 057300 Decorative Metal Railings | | | | 11/20/2018 |
| 057313 Glazed Decorative Metal Railings | | | | 11/20/2018 |
| 057500 Decorative Formed Metal | | | | 11/20/2018 |
| | | | | |
| **Division 06 – Wood, Plastics, and Composites** | | | | |
| | | | | |
| 061053 Miscellaneous Rough Carpentry | | | | 11/20/2018 |
| 061063 Exterior Rough Carpentry | | | | 11/20/2018 |
| 061600 Sheathing | | | | 11/20/2018 |
| 064116 Plastic-Laminate-Faced Architectural Cabinets | | | | 11/20/2018 |
| | | | | |
| **Division 07 - Thermal and Moisture Protection** | | | | |
| | | | | |
| 070150.19 Preparation for Reroofing | | | | 11/20/2018 |
| 071113 Bituminous Dampproofing | | | | 11/20/2018 |
| 071326 Self-Adhering Sheet Waterproofing | | | | 11/20/2018 |
| 071800 Traffic Coatings | | | | 11/20/2018 |
| 072100 Thermal Insulation | | | | 11/20/2018 |
| 072419 Water-Drainage Exterior Insulation and Finish System (EIFS) | | | | 11/20/2018 |
| 072600 Vapor Retarders | | | | 11/20/2018 |
| 072726 Fluid-Applied Membrane Air Barriers | | | | 11/20/2018 |
| ~~074113.16 Standing Seam Metal Roof Panels~~ | | | Deleted | 6/19/2020 |
| 074213.13 Formed Metal Wall Panels | | | | 11/20/2018 |
| 075419 Polyvinyl-Chloride (PVC) Roofing | | | | 6/19/2020 |
| 075423 Thermoplastic Polyolefin (TPO) Roofing | | | | 6/19/2020 |
| 076200 Sheet Metal Flashing and Trim | | | | 11/20/2018 |
| 077100 Roof Specialties | | | | 11/20/2018 |
| 077200 Roof Accessories | | | | 11/20/2018 |
| 078100 Applied Fireproofing | | | | 11/20/2018 |
| 078413 Penetration Firestopping | | | | 11/20/2018 |
| 079200 Joint Sealants | | | | 11/20/2018 |
| 079513.13 Interior Expansion Joint Cover Assemblies | | | | 6/19/2020 |
| 075913.16 Exterior Expansion Joint Cover Assemblies | | | | 6/19/2020 |
| | | | | |
| **Division 08 - Openings** | | | | |
| | | | | |
| 081113 Hollow Metal Doors and Frames | | | | 11/20/2018 |
| 081613 Fiberglass Doors and Frames | | | | 11/20/2018 |
| 083113 Access Doors and Frames | | | | 11/20/2018 |




| | | | | |
|---|---|---|---|---|
| 083213 Sliding Aluminum-Framed Glass Doors | | | | 6/19/2020 |
| 084113 Aluminum-Framed Entrances and Storefronts | | | | 6/19/2020 |
| 084229.23 Sliding Automatic Entrances | | | | 6/19/2020 |
| ~~085113 Aluminum Windows~~ | | | Deleted | 6/19/2020 |
| 087100 Door Hardware | | | | 6/19/2020 |
| 088000 Glazing | | | | 11/20/2018 |
| | | | | |
| **Division 09 – Finishes** | | | | |
| | | | | |
| 092116.23 Gypsum Board Shaft Wall Assemblies | | | | 11/20/2018 |
| 092216 Non-Structural Metal Framing | | | | 11/20/2018 |
| 092900 Gypsum Board | | | | 11/20/2018 |
| 093013 Ceramic Tiling | | | | 11/20/2018 |
| 095123 Acoustical Tile Ceilings | | | | 11/20/2018 |
| 095423 Linear Metal Ceilings | | | | 11/20/2018 |
| 096513 Resilient Base and Accessories | | | | 11/20/2018 |
| 096519 Resilient Tile Flooring | | | | 11/20/2018 |
| 096816 Sheet Carpeting | | | | 11/20/2018 |
| 099113 Exterior Painting | | | | 11/20/2018 |
| 099123 Interior Painting | | | | 11/20/2018 |
| | | | | |
| **Division 10 - Specialties** | | | | |
| | | | | |
| 102239.13 Folding Glass-Panel Partitions | | | | 11/20/2018 |
| 102600 Wall and Door Protection | | | | 11/20/2018 |
| 104413 Fire Protection Cabinets | | | | 11/20/2018 |
| 104416 Fire Extinguishers | | | | 11/20/2018 |
| 105113 Metal Lockers | | | | 11/20/2018 |
| | | | | |
| **Division 11 - Equipment** | | | | |
| | | | | |
| 111100 Laundry Equipment | | | | 11/20/2018 |
| 112429 Tie-Back and Life-Line Anchors | | | | 11/20/2018 |
| 113100 Residential Appliances | | | | 11/20/2018 |
| 114000 Food Service Equipment | | | | 11/20/2018 |
| ---------- Kitchen Cut Sheets | | | | 11/20/2018 |
| | | | | |
| **Division 12 – Furnishings** | | | | |
| | | | | |
| 123623.13 Plastic-Laminate-Clad Countertops | | | | 11/20/2018 |
| 124813 Entrance Floor Mats and Frames | | | | 11/20/2018 |
| | | | | |
| **Division 14 - Conveying Equipment** | | | | |
| | | | | |
| 142123.16 Machine-Room-less Electric Traction Passenger Elevators | | | | 11/20/2018 |
| 142400 Hydraulic Elevators | | | | 11/20/2018 |
| 149133 Laundry and Linen Chutes | | | | 11/20/2018 |

 

| | | | | | |
|---|---|---|---|---|---|
| **Division 21 - Fire Suppression** | | | | | |
| | | | | | |
| 215250 Fire Suppression Systems | | | | | 11/20/2018 |
| | | | | | |
| **Division 22 - Plumbing** | | | | | |
| | | | | | |
| 222300 Packaged Booster Pumping System | | | | | 11/20/2018 |
| 224000 Plumbing Systems | | | | | 11/20/2018 |
| 224240 Water Heaters and Accessories | | | | | 11/20/2018 |
| 224500 Plumbing Fixtures and Trim | | | | | 11/20/2018 |
| | | | | | |
| **Division 23 - Heating, Ventilating, and Air-Conditioning (HVAC)** | | | | | |
| | | | | | |
| 230100 Mechanical General | | | | | 11/20/2018 |
| 230430 HVAC Test & Balance | | | | | 11/20/2018 |
| 230600 HVAC Piping Systems | | | | | 11/20/2018 |
| 231810 HVAC Piping and Equipment Insulation | | | | | 11/20/2018 |
| 231900 Electric Heat Tracing | | | | | 11/20/2018 |
| 237400 Terminal Units | | | | | 11/20/2018 |
| 237440 Electric Duct Heaters | | | | | 11/20/2018 |
| 237730 Split Systems | | | | | 11/20/2018 |
| 237734 Variable Refrigerant Flow (VRF) HVAC System | | | | | 11/20/2018 |
| 237740 Packaged Rooftop Units | | | | | 11/20/2018 |
| 238000 Air Distribution Devices | | | | | 11/20/2018 |
| 238200 Fans | | | | | 11/20/2018 |
| 238400 Ductwork | | | | | 11/20/2018 |
| 239000 Automatic Controls and Energy Management System | | | | | 11/20/2018 |
| | | | | | |
| **Division 26 - Electrical** | | | | | |
| | | | | | |
| 260100 Electrical General | | | | | 11/20/2018 |
| 261000 Electrical Basic Materials & Methods | | | | | 11/20/2018 |
| 262000 Service and Distribution | | | | | 11/20/2018 |
| 263000 Lighting | | | | | 11/20/2018 |
| 266010 Lightning Protection | | | | | 11/20/2018 |
| 266100 Emergency System | | | | | 11/20/2018 |
| 266500 Surge Protective Device | | | | | 11/20/2018 |
| 269200 Motor Controls and Wiring | | | | | 11/20/2018 |
| | | | | | |
| **Division 28 - Electronic Safety and Security** | | | | | |
| | | | | | |
| 287210 Life Safety Systems for High Rise Buildings | | | | | 11/20/2018 |
| | | | | | |
| **Division 31 – Earthwork** | | | | | |
| | | | | | |
| 313116 Termite Control | | | | | 11/20/2018 |

A 6  

| | | | | | | |
|---|---|---|---|---|---|---|
| 316316 Augered Cast-In-Place (ACIP) Piles | | | | | | 11/20/2018 |
| | | | | | | |
| **Volume Two** | | | | | | |
| | | | | | | |
| **Design Standards** | | | | | | |
| | | | | | | |
| Renaissance Hotels, Hotel Design Standards | | | | | | 11/20/2018 |
| Marriott Design Standards, Modul 14 Fire Protection & Life Safety | | | | | | 11/20/2018 |

H-6

EXHIBIT "B"

SCOPE AND DESCRIPTION OF WORK

**See Attached**



## Crystal Hospitality Scopes of Work

| Drywall | $ 1,240,272 |
|---|---|
| Furnish & Install Framing 20 GA Metal Studs & runners for full height & long leg track | |
| Furnish & Install Framing 20 GA 1-5/8" studs with runners for soffits | |
| Furnish & Install Framing 20 GA RC Channel as Per Drawings | |
| Furnish & Install Framing 16 GA Metal Studs for All Exterior Framing | |
| Furnish & Install 20 GA 1-1/2" Z-Furring 24" OC With DOW Styrofoam | |
| Furnish & Install All Drywall with Level 5 Finish | |
| Furnish & Install 5/8" Dense Glass for Columns as per drawings | |
| Furnish & Install All Shaft Walls Per Drawings | |
| Furnish & Install 2 Layers of 5/8" Type "X" Drywall for 2-hour wall assemblies | |
| Furnish & Install 5/8" type "X" Drywall & 5/8" Type "MR" drywall for Restroom Lids | |
| Furnish & Install 5/8" Dense Shield for Restrooms Only | |
| Skim Coat Slab Deck (Ceiling?) | |
| Furnish & Install 2x6 Fire Treated Wood Blocking for all wall hung items | |
| Structural Engineering (Shop Drawings) | |
| All Fasteners Per Plans | |
| Furnish & Install Sound Caulk @ Top & Bottom of Guestroom Partition | |
| Fire-Caulk All Penetrations | |
| Soffits & Acoustical Ceilings (Furnish & Install) | |
| Insulation as Per Wall Details | |
| Equipment Rental Included | |
| Includes Public Areas | |
| | |
| Plumbing | $ 1,338,843 |
| All Materials: CPVC, PVC, Cast Iron, Per Plans | |
| Owner Provides (Shower Valves, Trim Kit, Faucets, Toilets0 | |
| All Plumbing Connection Valve Stop, P-Trap, Supply Lines, Etc. | |
| Swimming Pool Shower & Drain | |
| Storm Drain & Sewer, Piping & Connection to City | |
| Temporary Plumbing During Construction | |
| Grease Inceptor- Excluded | |
| Water Heater, Valves, Packaged Booster Pumping System (Control Panel), recirculation motor & accessories to connect water heater bladder tanks | |
| All Condensate Plumbing For (HVAC, VRF) | |
| Furnish Mincey Marble or equivalent IMI shower pan, depending on budget, (Trench Drain & Cover) | |
| Sovent System | |
| All Kitchen & Bar Equipment Connection, OFCI | |
| Provide Domestic Water Connection from City Per Plans | |
| Provide Cast Iron Bath-Tubs | |
| Fire-Stopping All Plumbing Penetrations | |
| Roof-Top Drains | |
| All Trim Out (Toilets, Trim-Kits, Kitchen Hook-Up, etc) | |
| Gas-Lines Included | |
| All Connections to kitchen/ bar included | |
| Megatron Digital Mixing Valve CFCI | |
| Owner Furnishes All Plumbing Fixtures & Trim | |
| Vanity OFCI | |
| | |
| Electrical | $ 1,957,065 |
| All Materials, Conduit Wiring, Fixtures, Dimming Panel, Electrical Panels | |
| Dimming Panel Installation & Programming | |
| Power to all exterior lighting & landscape lighting (Furnished By owner) | |
| Power to swimming pool | |

 

| | |
|---|---|
| Provide & Install Conduit for All Fire Alarm & Data Locations (Fire Alarm System Included) Following Marriott Specifications & Requirements | |
| All Transformer Gear for All Equipment (Elevator, Generator etc.) | |
| Provide Power to all water heaters, HVAC Units, Generator, Elevators, Kitchen Equipment | |
| Low Voltage- Cat 6 (2 Runs Per Room) | |
| Metal conduit for home runs, MC wiring for everything else | |
| Connect All Kitchen & Bar Equipment, OFCI | |
| Fire-Caulking | |
| All Decorative Fixtures by Owner | |
| Excludes Running All Conduit in metal box | |
| Gas Generator Included | |
| Temporary Power | |
| All Low Voltage Equipment/ Trim Out by Owner | |
| All Low Voltage Wiring by Contractor | |
| OFCI Decorative & OFCI Exterior Light Fixtures | |
| All Architectural Light Fixtures Are Included. (Public Area is by Drawings, Guestrooms are "to match" and be approved prior to ordering. | |
| Fire Alarm Included | |
| ABSOLUTE TURN-KEY ELECTRICAL SCOPE OF WORK. NO EXCEPTIONS UNLESS OTHERWISE NOTED | |
| | |
| **Exterior** | **$ 1,003,000** |
| Install New Glass Railings, Sliding Balcony Doors, Tower Windows, install Only | |
| Re-Finish All Exterior Walls with New Skim & Finish Coat (Color) | |
| Provide & Install Architectural Wood Screen System SS-1 & SS-2, Provide & Install SS-3 | |
| Provide & Install Concrete Panels at Low Rise, CP-1 & CP-2 With Required Prep at Low Rise (Equal Substitution Per Owner/Architect Approval) | |
| Smooth Stucco with Synthetic Finish @ Entire Building | |
| Master Wall Product for All Exterior EIFS & Stucco | |
| Arktura Excluded | |
| Provide Swing Stages, Crane & Other Equipment | |
| Site-Work, Pavers, Not Included | |
| Install New Low-Rise Windows (Install Only) | |
| Stucco Repair @ Balcony Walls | |
| Skim & Color Sea Wall | |
| | |
| **Wall Finishes** | **$ 415,338** |
| Prime All Walls & Ceilings & Final Coat | |
| Paint All Walls & Ceilings at Guest Tower, Public Areas & Back of House, As Per ID Drawings with Promar 400 | |
| Paint of All Door Frames, Prepare as Needed | |
| Caulking for All Paint, VWC, Tile, Etc. (Fire-Caulking Included above) | |
| OFCI VWC | |
| OFCI Millwork Panel Install At Guest-Corridors | |
| Stairwell Painting | |
| Any Other Painting Scope Not Mentioned Above Included | |
| Includes FRP Panels at Kitchen, etc. | |
| Includes Installation of Decorative Finish Behind Headboard (OFCI) | |
| All Public Areas & Back of House Included | |
| Corridor Wall Painting | |
| | |
| **Floor Finishes** | **$ 689,987** |
| OFCI Tile Install as Per ID Drawings. CFCI Grout | |
| Durock Install for All Wall Tile (Guestbath, Public Restrooms) Not included in Drywall) | |
| Kitchen Tile Scope Included | |
| OFCI Rubber Flooring Included | |
| All Carpet, Tack-Strips, Pad, OFCI | |

A G 

| | |
|---|---|
| All Flooring Finishes OFCI | |
| OFCI Tile @ Elevator Landings & Vending | |
| Corridor Carpet, OFCI, Double Stick Included | |
| Tile Square footage ranges from $5.00-$7.00 depending on location & tile | |
| Custom Brand, Sure color Product Grout | |
| Any Floor Prep Materials By Owner, Crystal provides Labor FOC | |
| All Transitions By Crystal (Thresholds By Owner) | |
| | |
| **Door Install** | $   168,000 |
| Install Owner Furnished Guest-room Entry Door, Door Frame & Door Hardware, Connecting Door Frame & Hardware | |
| Install Owner Furnished Pocket Doors at Guest-Bath | |
| Install Owner Furnished Shower Door/ Glass Partition | |
| Install Owner Furnished Toilet Door & Glass Partition | |
| Install Owner Furnished Stairwell Doors, Other Storage Room Doors, etc. on Guest-Floors (Doors & Hardware) | |
| Install Owner Furnished Interior Public Area Doors, Door Frames & Hardware | |
| Install Owner Furnished Back-Of House Doors | |
| Install Exterior Doors & Hardware | |
| | |
| **General Conditions** | $   337,495 |
| Dumpster/ Disposal by Owner | |
| Provide On-Site, Off-Site Supervision/ Administration | |
| Project Rentals by Owner (Fencing, Office, Porta-Potty, etc. | |
| Provide Any Extra Labor Costs | |
| Overhead/ Profit | |
| Daily Cleaning | |
| | |
| **Total Amount** | $ 7,150,000 |

HG  (M)

EXHIBIT "C"

PROJECT SCHEDULE

**See Attached**

19



**Crystal Hospitality Scopes of Work**

| Drywall | $ 1,240,272 |
|---|---|
| Furnish & Install Framing 20 GA Metal Studs & runners for full height & long leg track | |
| Furnish & Install Framing 20 GA 1-5/8" studs with runners for soffits | |
| Furnish & Install Framing 20 GA RC Channel as Per Drawings | |
| Furnish & Install Framing 16 GA Metal Studs for All Exterior Framing | |
| Furnish & Install 20 GA 1-1/2" Z-Furring 24" OC With DOW Styrofoam | |
| Furnish & Install All Drywall with Level 5 Finish | |
| Furnish & Install 5/8" Dense Glass for Columns as per drawings | |
| Furnish & Install All Shaft Walls Per Drawings | |
| Furnish & Install 2 Layers of 5/8" Type "X" Drywall for 2-hour wall assemblies | |
| Furnish & Install 5/8" type "X" Drywall & 5/8" Type "MR" drywall for Restroom Lids | |
| Furnish & Install 5/8" Dense Shield for Restrooms Only | |
| Skim Coat Slab Deck (Ceiling?) | |
| Furnish & Install 2x6 Fire Treated Wood Blocking for all wall hung items | |
| Structural Engineering (Shop Drawings) | |
| All Fasteners Per Plans | |
| Furnish & Install Sound Caulk @ Top & Bottom of Guestroom Partition | |
| Fire-Caulk All Penetrations | |
| Soffits & Acoustical Ceilings (Furnish & Install) | |
| Insulation as Per Wall Details | |
| Equipment Rental Included | |
| Includes Public Areas | |

| Plumbing | $ 1,338,843 |
|---|---|
| All Materials: CPVC, PVC, Cast Iron, Per Plans | |
| Owner Provides (Shower Valves, Trim Kit, Faucets, Toilets0 | |
| All Plumbing Connection Valve Stop, P-Trap, Supply Lines, Etc. | |
| Swimming Pool Shower & Drain | |
| Storm Drain & Sewer, Piping & Connection to City | |
| Temporary Plumbing During Construction | |
| Grease Inceptor- Excluded | |
| Water Heater, Valves, Packaged Booster Pumping System (Control Panel), recirculation motor & accessories to connect water heater bladder tanks | |
| All Condensate Plumbing For (HVAC, VRF) | |
| Furnish Mincey Marble or equivalent IMI shower pan, depending on budget, (Trench Drain & Cover) | |
| Sovent System | |
| All Kitchen & Bar Equipment Connection, OFCI | |
| Provide Domestic Water Connection from City Per Plans | |
| Provide Cast Iron Bath-Tubs | |
| Fire-Stopping All Plumbing Penetrations | |
| Roof-Top Drains | |
| All Trim Out (Toilets, Trim-Kits, Kitchen Hook-Up, etc) | |
| Gas-Lines Included | |
| All Connections to kitchen/ bar included | |
| Megatron Digital Mixing Valve CFCI | |
| Owner Furnishes All Plumbing Fixtures & Trim | |
| Vanity OFCI | |

| Electrical | $ 1,957,065 |
|---|---|
| All Materials, Conduit Wiring, Fixtures, Dimming Panel, Electrical Panels | |
| Dimming Panel Installation & Programming | |
| Power to all exterior lighting & landscape lighting (Furnished By owner) | |
| Power to swimming pool | |

A6 

| | |
|---|---|
| Provide & Install Conduit for All Fire Alarm & Data Locations (Fire Alarm System Included) Following Marriott Specifications & Requirements | |
| All Transformer Gear for All Equipment (Elevator, Generator etc.) | |
| Provide Power to all water heaters, HVAC Units, Generator, Elevators, Kitchen Equipment | |
| Low Voltage- Cat 6 (2 Runs Per Room) | |
| Metal conduit for home runs, MC wiring for everything else | |
| Connect All Kitchen & Bar Equipment, OFCI | |
| Fire-Caulking | |
| All Decorative Fixtures by Owner | |
| Excludes Running All Conduit in metal box | |
| Gas Generator Included | |
| Temporary Power | |
| All Low Voltage Equipment/ Trim Out by Owner | |
| All Low Voltage Wiring by Contractor | |
| OFCI Decorative & OFCI Exterior Light Fixtures | |
| All Architectural Light Fixtures Are Included. (Public Area is by Drawings, Guestrooms are "to match" and be approved prior to ordering. | |
| Fire Alarm Included | |
| ABSOLUTE TURN-KEY ELECTRICAL SCOPE OF WORK. NO EXCEPTIONS UNLESS OTHERWISE NOTED | |

| | |
|---|---|
| **Exterior** | **$ 1,003,000** |
| Install New Glass Railings, Sliding Balcony Doors, Tower Windows, install Only | |
| Re-Finish All Exterior Walls with New Skim & Finish Coat (Color) | |
| Provide & Install Architectural Wood Screen System SS-1 & SS-2, Provide & Install SS-3 | |
| Provide & Install Concrete Panels at Low Rise, CP-1 & CP-2 With Required Prep at Low Rise (Equal Substitution Per Owner/Architect Approval) | |
| Smooth Stucco with Synthetic Finish @ Entire Building | |
| Master Wall Product for All Exterior EIFS & Stucco | |
| Arktura Excluded | |
| Provide Swing Stages, Crane & Other Equipment | |
| Site-Work, Pavers, Not Included | |
| Install New Low-Rise Windows (Install Only) | |
| Stucco Repair @ Balcony Walls | |
| Skim & Color Sea Wall | |

| | |
|---|---|
| **Wall Finishes** | **$   415,338** |
| Prime All Walls & Ceilings & Final Coat | |
| Paint All Walls & Ceilings at Guest Tower, Public Areas & Back of House, As Per ID Drawings with Promar 400 | |
| Paint of All Door Frames, Prepare as Needed | |
| Caulking for All Paint, VWC, Tile, Etc. (Fire-Caulking Included above) | |
| OFCI VWC | |
| OFCI Millwork Panel Install At Guest-Corridors | |
| Stairwell Painting | |
| Any Other Painting Scope Not Mentioned Above Included | |
| Includes FRP Panels at Kitchen, etc. | |
| Includes Installation of Decorative Finish Behind Headboard (OFCI) | |
| All Public Areas & Back of House Included | |
| Corridor Wall Painting | |

| | |
|---|---|
| **Floor Finishes** | **$   689,987** |
| OFCI Tile Install as Per ID Drawings. CFCI Grout | |
| Durock Install for All Wall Tile (Guestbath, Public Restrooms) Not included in Drywall) | |
| Kitchen Tile Scope Included | |
| OFCI Rubber Flooring Included | |
| All Carpet, Tack-Strips, Pad, OFCI | |

A6 

| | |
|---|---|
| All Flooring Finishes OFCI | |
| OFCI Tile @ Elevator Landings & Vending | |
| Corridor Carpet, OFCI, Double Stick Included | |
| Tile Square footage ranges from $5.00-$7.00 depending on location & tile | |
| Custom Brand, Sure color Product Grout | |
| Any Floor Prep Materials By Owner, Crystal provides Labor FOC | |
| All Transitions By Crystal (Thresholds By Owner) | |
| | |
| **Door Install** | $    168,000 |
| Install Owner Furnished Guest-room Entry Door, Door Frame & Door Hardware, Connecting Door Frame & Hardware | |
| Install Owner Furnished Pocket Doors at Guest-Bath | |
| Install Owner Furnished Shower Door/ Glass Partition | |
| Install Owner Furnished Toilet Door & Glass Partition | |
| Install Owner Furnished Stairwell Doors, Other Storage Room Doors, etc. on Guest-Floors (Doors & Hardware) | |
| Install Owner Furnished Interior Public Area Doors, Door Frames & Hardware | |
| Install Owner Furnished Back-Of House Doors | |
| Install Exterior Doors & Hardware | |
| | |
| **General Conditions** | $    337,495 |
| Dumpster/ Disposal by Owner | |
| Provide On-Site, Off-Site Supervision/ Administration | |
| Project Rentals by Owner (Fencing, Office, Porta-Potty, etc. | |
| ~~Provide Any Extra Labor Costs~~ *A.G.* | |
| Overhead/ Profit | |
| Daily Cleaning | |
| | |
| **Total Amount** | $ 7,150,000 |

*A.G.* Ⓜ

# **EXHIBIT B**

Bond Number: CMGP00004440



# AIA® Document A312™ – 2010

## Performance Bond

CONTRACTOR:
*(Name, legal status and address)*

**CRYSTAL HOSPITALITY, LLC
706 Executive Court
Woodstock, GA 30189**

OWNER:
*(Name, legal status and address)*
**Infinity General Construction Services, Inc.
730 S. Atlantic Ave.,
Ormond Beach, FL 32118**

SURETY:  **Argonaut Insurance Company
c/o CMGIA
20335 Ventura Blvd., Ste. 426
Woodland Hills, CA 91364**

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

CONSTRUCTION CONTRACT
Date: **2/01/2021**

Amount: **FIVE MILLION ONE HUNDRED NINETY TWO THOUSAND NINE HUNDRED THIRTY FIVE AND 00/100 ($5,192,935.00)**

Description:
*(Name and location)*
**Renaissance
640 N. Atlantic Ave., Daytona Beach, FL 32811**

BOND
Date: **5/25/2021**
*(Not earlier than Construction Contract Date)*

Amount: **FIVE MILLION ONE HUNDRED NINETY TWO THOUSAND NINE HUNDRED THIRTY FIVE AND 00/100 ($5,192,935.00)**

Modifications to this Bond:    ☐ None    ☒ See Section 16

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company:          *(Corporate Seal)* | Company:          *(Corporate Seal)* |
| **CRYSTAL HOSPITALITY, LLC** | **Argonaut Insurance Company** |
| Signature: *andrey gerega* | Signature: |
| Name     Andrey Gerega, CEO | Name     Stephanie Hope Shear |
| and Title: | and Title: Attorney-in-Fact |

*(Any additional signatures appear on the last page of this Performance Bond)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
AGENT or BROKER:                    OWNER'S REPRESENTATIVE:

Init.

/

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on    02/28/2012 11:24:44    under the terms of AIA Documents-on-Demand™ order no. 2886406923    , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

981010

1

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**§ 2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

.1    the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

.2    the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

.3    the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

**§ 4** Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

**§ 5** When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**§ 5.1** Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

**§ 5.2** Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

**§ 5.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

**§ 5.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1    After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2    Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

**§ 6** If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on    02/28/2012 11:24:44    under the terms of AIA Documents-on-Demand™ order no.    2008406923, and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

§ 7 If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

   .1     the responsibilities of the Contractor for correction of defective work and completion of the
          Construction Contract;
   .2     additional legal, design professional and delay costs resulting from the Contractor's Default, and
          resulting from the actions or failure to act of the Surety under Section 5; and
   .3     liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual
          damages caused by delayed performance or non-performance of the Contractor.

§ 8 If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

§ 9 The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

§ 10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 11 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

§ 13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 14 Definitions
§ 14.1 Balance of the Contract Price. The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

§ 14.2 Construction Contract. The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

§ 14.3 Contractor Default. Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

§ 14.4 Owner Default. Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

§ 14.5 Contract Documents. All the documents that comprise the agreement between the Owner and Contractor.

§ 15 If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

Init.

/

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on      02/28/2012 11 24 44      under the terms of AIA Documents-on-Demand™ order no.      2008406923 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

3

§ 16 Modifications to this bond are as follows:

**SEE ATTACHED**

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company: *(Corporate Seal)* | Company: *(Corporate Seal)* |
| CRYSTAL HOSPITALITY, LLC | Argonaut Insurance Company |
| Signature: *andrey gerega* | Signature: |
| Name and Title: Andrey Gerega, CEO | Name and Title: Stephanie Hope Shear, Attorney-in-Fact |
| Address: 706 Executive CT | Address: C/O CMGIA 20335 Ventura Blvd., Ste. 426 |
| Woodstock, GA 30189 | Woodland Hills, CA 91364 |

Init.

/

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on   02/28/201311:24:44           under the terms of AIA Documents-on-Demand™ order no.   2008486923       , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

4

# COVID-19 PERFORMANCE BOND NOTICE RIDER

This Rider is executed concurrently with and shall be attached to and form a part of Bond No.: CMGP00004440

WHEREAS, on or about the __1st__, day of __February__, __2021__, __CRYSTAL HOSPITALITY, LLC__ (hereinafter called the "Principal"), entered into a written agreement with __Infinity General Construction Services, Inc.__ (hereinafter called the "Primary Obligee") for the construction of the __Renaissance__ __640 N. Atlantic Ave., Daytona Beach, FL 32811__ (hereinafter called the "Contract"); and

WHEREAS, Principal and Argonaut Insurance Company (hereinafter referred to as "Surety") have agreed to execute and deliver this Rider in conjunction Bond No.: CMGP00004440

WHEREAS, the BOND has been required and/or requested by the OBLIGEE during a national epidemic or pandemic. In response, the federal, state, and local governments have issued stay-at-home and/or emergency orders in order to protect public health.

WHEREAS, this RIDER is created, effective, and issued contemporaneously with the term of the BOND, and the SURETY and PRINCIPAL rely upon the effectiveness of this RIDER and the incorporation of its interpretation of the terms and obligations of the BOND at the beginning of its term as an inducement to its agreement of the terms and obligations of the BOND.

WHEREAS, quarantine procedures have been issued by the appropriate governmental authorities in the interest of public health to reduce or prevent the epidemic or pandemic.

WHEREAS, as the orders and actions of the government are ever-changing, no party can adequately predict how the Bonded Project may be affected. Accordingly, any delays, costs increases, labor shortages, availability of materials, or any other event hindering the performance of any party's contractual duties caused by or related to the epidemic or pandemic are unforeseen at the time of formation of the contract.

The SURETY's bonded obligations under the BOND are clarified by this RIDER, or to the extent necessary, modified as follows:

1.    In the event of any delays, cost increases, labor shortages, availability of materials, or any other event hindering the performance of any party's contractual duties caused by or related to any epidemic or pandemic, the SURETY agrees to cooperate with the PRINCIPAL and the OBLIGEE to assist with the completion of the contract

# COVID-19 PERFORMANCE BOND NOTICE RIDER

and comply with any and all directives from federal, state, and local authorities to maintain to the public health.

2.      The BOND has been issued during an epidemic or pandemic, but the specific impacts, delays, defaults, or damages relating to the pandemic on the performance of the contract are unknown to the SURETY, OBLIGEE, and PRINCIPAL and are unforeseen at the time of formation of the BOND.

3.      The SURETY agrees to assist all parties to mitigate any potential damages on the Project. The parties' duty to mitigate has not been abridged. The SURETY will comply with all federal, state, or local governmental guidance regarding the performance of the contract and the protection of public health and that of their employees.

4.      If performance of the OBLIGEE's and/or the PRINCIPAL's obligations under the contract becomes impracticable as caused by or related to the effects of any epidemic or pandemic and/or related governmental orders, the SURETY's obligations hereunder are likewise deemed impracticable. Impracticability is defined as the existence of a fact or circumstance which makes the performance of the duty to be unfeasibly difficult or expensive. The standard for unfeasibility is whether performance is commercially unreasonable.

5.      If the contracts, agreements, or other documents require notice from the PRINCIPAL and/or the SURETY regarding epidemic or pandemic related impacts on the Bonded Project, the OBLIGEE is deemed to have sufficient notice upon receipt of this RIDER.

Except as herein modified, the Bond shall be and remains in full force and effect.

SIGNED AND DATED THIS __25th__ day of ___May___, _2021_.

Argonaut Insurance Company (SURETY)

By: _____

Name: __Stephanie Hope Shear__

Title: __Attorney-In-Fact__

**COVID-19 PERFORMANCE BOND NOTICE RIDER**



# STATE OF GEORGIA
# OFFICE OF INSURANCE AND SAFETY FIRE COMMISSIONER
# CERTIFICATE OF AUTHORITY

WHEREAS, **ARGONAUT INSURANCE COMPANY**, ORGANIZED UNDER THE LAWS AND REGULATIONS OF THE STATE OF ILLINOIS, HAVING COMPLIED WITH THE REQUIREMENTS OF THE LAWS AND REGULATIONS OF THIS STATE AS ARE APPLICABLE TO SUCH ORGANIZATION, IT IS HEREBY LICENSED TO TRANSACT THE BUSINESS OF INSURANCE IN THE STATE OF GEORGIA ACCORDING TO THE LAWS THEREOF, WITH RESPECT TO THE FOLLOWING CLASSES AND/OR LINES OF INSURANCE:

PROPERTY; MARINE AND TRANS; CASUALTY (INCL WORKERS' COMP); SURETY

NOTHING CONTAINED IN THIS LICENSE AUTHORIZES THE LICENSEE TO ENGAGE IN OR WRITE ANY CLASSES OR KINDS OF INSURANCE IN THIS STATE FOR WHICH THE LICENSEE IS NOT AUTHORIZED IN ITS STATE OF DOMICILE.

PURSUANT TO O.C.G.A. SECTION 33-3-16(a), THIS CERTIFICATE OF AUTHORITY EXPIRES AT 11:59 P.M. ON JUNE 30, **2021**, UNLESS SUSPENDED OR REVOKED IN THE MANNER PROVIDED BY LAW.

GIVEN UNDER MY HAND AND SEAL OF OFFICE
THIS DAY, JUNE 2, 2020

JOHN F. KING
COMMISSIONER OF INSURANCE



LICENSE NUMBER: 2000790
NAIC NUMBER: 19801

Bond No.: **CMGP00004440**

# Argonaut Insurance Company
## Deliveries Only: 225 W. Washington, 24th Floor
## Chicago, IL 60606
## United States Postal Service: P.O. Box 469011, San Antonio, TX 78246
# POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That the Argonaut Insurance Company, a Corporation duly organized and existing under the laws of the State of Illinois and having its principal office in the County of Cook, Illinois does hereby nominate, constitue and appoint:

Gabriella Grady, Shilo Lee Losino, Stephanie Hope Shear, Elizabeth Santos, Stacey Garcia, Matthew Dionisio

Their true and lawful agent(s) and attorney(s)-in-fact, each in their separate capacity if more than one is named above, to make, execute, seal and deliver for and on its behalf as surety, and as its act and deed any and all bonds, contracts, agreements of indemnity and other undertakings in suretyship provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

$15,000,000.00

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolution adopted by the Board of Directors of Argonaut Insurance Company:

"RESOLVED, That the President, Senior Vice President, Vice President, Assistant Vice President, Secretary, Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney, of the Company, qualifying the attorney or attorneys named in the given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the Argonaut Insurance Company, all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF, Argonaut Insurance Company has caused its official seal to be hereunto affixed and these presents to be signed by its duly authorized officer on the 8th day of May, 2017.

Argonaut Insurance Company

**SEAL** 1948 ILLINOIS

by: _____

Joshua C. Betz , Senior Vice President

STATE OF TEXAS
COUNTY OF HARRIS  SS:

On this 8th day of May, 2017 A.D., before me, a Notary Public of the State of Texas, in and for the County of Harris, duly commissioned and qualified, came THE ABOVE OFFICER OF THE COMPANY, to me personally known to be the individual and officer described in, and who executed the preceding instrument, and he acknowledged the execution of same, and being by me duly sworn, deposed and said that he is the officer of the said Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and the said Corporate Seal and his signature as officer were duly affixed and subscribed to the said instrument by the authority and direction of the said corporation, and that Resolution adopted by the Board of Directors of said Company, referred to in the preceding instrument is now in force.

IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Harris, the day and year first above written.

KATHLEEN M. MEEKS
Notary Public, State of Texas
Comm. Expires 07-15-2021

Kathleen M. Meeks
(Notary Public)

I, the undersigned Officer of the Argonaut Insurance Company, Illinois Corporation, do hereby certify that the original POWER OF ATTORNEY of which the foregoing is a full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand, and affixed the Seal of said Company, on the **25th** day of _____ **May** , **2021** .

**SEAL** 1948 ILLINOIS

_____

James Bluzard , Vice President-Surety

**IF YOU HAVE QUESTIONS ON AUTHENTICITY OF THIS DOCUMENT CALL (833) 820 - 9137.**

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of _____ Los Angeles _____ )

On _____ MAY 2 5 2021 _____ before me. _____ Lucas Patterson, Notary Public _____,
                Date                                        Here Insert Name and Title of the Officer

personally appeared _____ Stephanie Hope Shear
                                                            Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> LUCAS PATTERSON
> Notary Public · California
> Los Angeles County
> Commission # 2352264
> My Comm. Expires Mar 19, 2025

Signature _____
                            Signature of Notary Public

Place Notary Seal Above

------------------------------ OPTIONAL ------------------------------
Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association · www.NationalNotary.org · 1-800-US NOTARY (1-800-876-6827)    Item #5907

Bond Number: CMGP00004440

 **AIA** Document A312™ – 2010

## Payment Bond

**CONTRACTOR:**
*(Name, legal status and address)*
**CRYSTAL HOSPITALITY, LLC**
**706 Executive Court**
**Woodstock, GA 30189**

**SURETY:** **Argonaut Insurance Company**
c/o CMGIA
20335 Ventura Blvd., Ste. 426
Woodland Hills, CA 91364

**OWNER:**
*(Name, legal status and address)*
**Infinity General Construction Services, Inc.**
**730 S. Atlantic Ave.,**
**Ormond Beach, FL 32118**

**CONSTRUCTION CONTRACT**
Date: **2/01/2021**

Amount: **FIVE MILLION ONE HUNDRED NINETY TWO THOUSAND NINE HUNDRED THIRTY FIVE AND 00/100 ($5,192,935.00)**

Description:
*(Name and location)*
**Renaissance**
**640 N. Atlantic Ave., Daytona Beach, FL 32811**

**BOND**
Date: **5/25/2021**
*(Not earlier than Construction Contract Date)*

Amount: **FIVE MILLION ONE HUNDRED NINETY TWO THOUSAND NINE HUNDRED THIRTY FIVE AND 00/100 ($5,192,935.00)**

Modifications to this Bond:  ☒ None     ☐ See Section 18

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**CONTRACTOR AS PRINCIPAL**
Company:          *(Corporate Seal)*
**CRYSTAL HOSPITALITY, LLC**

Signature: *andrey gerega*
Name
and Title:  Andrey Gerega CEO

**SURETY**
Company:          *(Corporate Seal)*
**Argonaut Insurance Company**

Signature:
Name
and Title:  Stephanie Hope Shear
Attorney-in-Fact

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*
**AGENT or BROKER:**

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on 02/28/2012 11:24:44 under the terms of AIA Documents-on-Demand™ order no. 2008406923, and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion. 061919

5

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

**§ 2** If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

**§ 4** When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

**§ 5** The Surety's obligations to a Claimant under this Bond shall arise after the following:

**§ 5.1** Claimants, who do not have a direct contract with the Contractor,

    **.1** have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and

    **.2** have sent a Claim to the Surety (at the address described in Section 13).

**§ 5.2** Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

**§ 6** If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

**§ 7** When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

**§ 7.1** Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

**§ 7.2** Pay or arrange for payment of any undisputed amounts.

**§ 7.3** The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

**§ 8** The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

**§ 9** Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on 02/28/2012 11:24:44 under the terms of AIA Documents-on-Demand™ order no. 2008406923, and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

**§ 10** The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

**§ 11** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 12** No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 13** Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

**§ 14** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**§ 15** Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

**§ 16 Definitions**
**§ 16.1 Claim.** A written statement by the Claimant including at a minimum:
- .1    the name of the Claimant;
- .2    the name of the person for whom the labor was done, or materials or equipment furnished;
- .3    a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
- .4    a brief description of the labor, materials or equipment furnished;
- .5    the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
- .6    the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
- .7    the total amount of previous payments received by the Claimant; and
- .8    the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

**§ 16.2 Claimant.** An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

**§ 16.3 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on        02/28/2012 11:24:44        under the terms of
AIA Documents-on-Demand™ order no.        2008406923, and is not for resale. This document is licensed by The American Institute of Architects for
one-time use only, and may not be reproduced prior to its completion.

**§ 16.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 16.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 17** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 18** Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

CONTRACTOR AS PRINCIPAL                          SURETY
Company:                    *(Corporate Seal)*    Company:                    *(Corporate Seal)*
CRYSTAL HOSPITALITY, LLC                         Argonaut Insurance Company

Signature: *andrey gerega*                        Signature:
Name and Title: Andrey Gerega CEO                 Name and Title: Stephanie Hope Sheer, Attorney-in-Fact
Address: 706 Executive CT                         Address: C/O CMGIA 20335 Ventura Blvd., Ste. 426
Woodstock, GA 30189                               Woodland Hills, CA 91364

Init.

AIA Document A312™ – 2010. The American Institute of Architects. This document was created on    02/28/2012 11:24:44    under the terms of AIA Documents-on-Demand™ order no.    2006406923 , and is not for resale. This document is licensed by The American Institute of Architects for one-time use only, and may not be reproduced prior to its completion.

8



# STATE OF GEORGIA
# OFFICE OF INSURANCE AND SAFETY FIRE COMMISSIONER
## CERTIFICATE OF AUTHORITY

WHEREAS, **ARGONAUT INSURANCE COMPANY**, ORGANIZED UNDER THE LAWS AND REGULATIONS OF THE STATE OF ILLINOIS, HAVING COMPLIED WITH THE REQUIREMENTS OF THE LAWS AND REGULATIONS OF THIS STATE AS ARE APPLICABLE TO SUCH ORGANIZATION, IT IS HEREBY LICENSED TO TRANSACT THE BUSINESS OF INSURANCE IN THE STATE OF GEORGIA ACCORDING TO THE LAWS THEREOF, WITH RESPECT TO THE FOLLOWING CLASSES AND/OR LINES OF INSURANCE:

PROPERTY; MARINE AND TRANS; CASUALTY (INCL WORKERS' COMP); SURETY

NOTHING CONTAINED IN THIS LICENSE AUTHORIZES THE LICENSEE TO ENGAGE IN OR WRITE ANY CLASSES OR KINDS OF INSURANCE IN THIS STATE FOR WHICH THE LICENSEE IS NOT AUTHORIZED IN ITS STATE OF DOMICILE.

PURSUANT TO O.C.G.A. SECTION 33-3-16(a), THIS CERTIFICATE OF AUTHORITY EXPIRES AT 11:59 P.M. ON JUNE 30, 2021, UNLESS SUSPENDED OR REVOKED IN THE MANNER PROVIDED BY LAW.

GIVEN UNDER MY HAND AND SEAL OF OFFICE
THIS DAY, JUNE 2, 2020

JOHN F. KING
COMMISSIONER OF INSURANCE



LICENSE NUMBER: 2000790
NAIC NUMBER: 19801

Bond No.:  CMGP00004440

# Argonaut Insurance Company
### Deliveries Only: 225 W. Washington, 24th Floor
### Chicago, IL 60606
### United States Postal Service: P.O. Box 469011, San Antonio, TX 78246
# POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That the Argonaut Insurance Company, a Corporation duly organized and existing under the laws of the State of Illinois and having its principal office in the County of Cook, Illinois does hereby nominate, constitute and appoint:

Gabriella Grady, Shilo Lee Losino, Stephanie Hope Shear, Elizabeth Santos, Stacey Garcia, Matthew Dionisio

Their true and lawful agent(s) and attorney(s)-in-fact, each in their separate capacity if more than one is named above, to make, execute, seal and deliver for and on its behalf as surety, and as its act and deed any and all bonds, contracts, agreements of indemnity and other undertakings in suretyship provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

$15,000,000.00

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolution adopted by the Board of Directors of Argonaut Insurance Company:

"RESOLVED, That the President, Senior Vice President, Vice President, Assistant Vice President, Secretary, Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney, of the Company, qualifying the attorney or attorneys named in the given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the Argonaut Insurance Company, all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF, Argonaut Insurance Company has caused its official seal to be hereunto affixed and these presents to be signed by its duly authorized officer on the 8th day of May, 2017.

Argonaut Insurance Company

by:

Joshua C. Betz , Senior Vice President

STATE OF TEXAS
COUNTY OF HARRIS  SS:

On this 8th day of May, 2017 A.D., before me, a Notary Public of the State of Texas, in and for the County of Harris, duly commissioned and qualified, came THE ABOVE OFFICER OF THE COMPANY, to me personally known to be the individual and officer described in, and who executed the preceding instrument, and he acknowledged the execution of same, and being by me duly sworn, deposed and said that he is the officer of the said Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and the said Corporate Seal and his signature as officer were duly affixed and subscribed to the said instrument by the authority and direction of the said corporation, and that Resolution adopted by the Board of Directors of said Company, referred to in the preceding instrument is now in force.

IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Harris, the day and year first above written.

(Notary Public)

I, the undersigned Officer of the Argonaut Insurance Company, Illinois Corporation, do hereby certify that the original POWER OF ATTORNEY of which the foregoing is a full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand, and affixed the Seal of said Company, on the **25th** day of **May** , **2021** .

James Bluzard , Vice President-Surety

**IF YOU HAVE QUESTIONS ON AUTHENTICITY OF THIS DOCUMENT CALL (833) 820 - 9137.**

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of _____ Los Angeles )

On _**MAY 2 5 2021**_ before me, _____ Lucas Patterson  Notary Public

Date

*Here Insert Name and Title of the Officer*

personally appeared _____ Stephanie Hope Shear

*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

**LUCAS PATTERSON**
Notary Public - California
Los Angeles County
Commission # 2332264
My Comm. Expires Mar 19, 2025

Signature _____

*Signature of Notary Public*

*Place Notary Seal Above*

———————————— **OPTIONAL** ————————————

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____  Document Date: _____

Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____

☐ Corporate Officer — Title(s): _____

☐ Partner — ☐ Limited ☐ General

☐ Individual ☐ Attorney in Fact

☐ Trustee ☐ Guardian or Conservator

☐ Other: _____

Signer Is Representing: _____

Signer's Name: _____

☐ Corporate Officer — Title(s): _____

☐ Partner — ☐ Limited ☐ General

☐ Individual ☐ Attorney in Fact

☐ Trustee ☐ Guardian or Conservator

☐ Other: _____

Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

# **<u>EXHIBIT C</u>**

**Change Order**

*AG    N.P.*

**To:** Crystal Hospitality, LLC

**Date:** ~~June 29, 2022~~  *July 8ᵗʰ 2022*

**Address:** 706 Executive Court
Woodstock, Georgia 30189

**Project:** Renaissance
640 N. Atlantic Ave.
Daytona Beach, Florida 32811

**Subcontract:**
Subcontract Agreement dated February 1, 2021

**Change Order No.:** 10

The above-referenced Subcontract is changed as follows:

In exchange for the compensation under this Change Order and other consideration, Crystal Hospitality, LLC ("Crystal") releases and waives all damages, claims for extra work, extended or additional job cost and overhead, extended and/or expanded general condition/job site costs, lost profits, and impact costs. Such impact costs include claims and demands related to any claimed or unclaimed delays, disruptions, interferences, inefficiencies, lost productivity, acceleration, or changes to the work that relate to the above Project.

Crystal agrees that the compensation provided under this Change Order is intended to compensate Crystal in full for any and all additional compensation or time to complete its Work (as defined in the Subcontract) to which Crystal believes it is entitled, and Crystal shall not be entitled to additional compensation or time to complete its Work due to, in whole or in part, any increase in the cost of supervision, labor, tools, equipment, services, and all other items necessary or required to fully perform the Subcontract to the satisfaction of Infinity General Construction Services, Inc. ("Infinity"). Crystal further agrees that it shall not be entitled to any additional compensation or time to complete its Work under any circumstances for the remainder of the Project unless Infinity directs Crystal to perform work outside its scope of work under the Subcontract.

As provided in paragraph 6.3 of the Subcontract, should Crystal be delayed in the commencement, prosecution, or completion of the Work by no fault, neglect, act, or omission on Crystal's part, then the Subcontractor's sole remedy shall be limited to an extension of time only and Crystal shall have no claim for any damages whatsoever with one exception—Crystal may be compensated for any additional reasonable cost of lodging for its employees working at the Project.

Crystal reaffirms that it shall complete its Work as provided under the Subcontract, including, but not limited to, the specific items of work noted in **Exhibit 1** attached to this Change Order. Crystal further agrees it will perform its Work in accordance with the updated project schedule attached to this Change Order as **Exhibit 2**, including achieving substantial completion of its scope of work no later than ~~February 24, 2023.~~  *March, 14ᵗʰ 2023    Based on July 7ᵗʰ 2022 update*

| | | *A.G.* |
|---|---|---|
| The original Contract Price was | $5,192,935.00 | *N.P.* |
| The net change by previously authorized Change Orders | -$164,544.81 | |
| The Contract Price prior to this Change Order was | $5,028,390.19 | |
| The Contract Price will be increased by this Change Order in the amount of | $700,000 | |
| The new Contract Price including this Change Order will be | $5,728,390.19 | |

The terms and conditions of the Subcontract remain unchanged except as expressly modified in this Change Order.

**[Signatures on next page.]**

1

| Subcontractor:<br>Crystal Hospitality, LLC | Contractor:<br>Infinity General Construction Services, Inc. |
|---|---|
| By: _____  07 08 2022<br>(Signature)            (Date) | By: _____  7/8/22<br>(Signature)            (Date) |
| Andrey Gerega  Member<br>(Printed Name)       (Title) | Nitesh Patel  PM<br>(Printed Name)       (Title) |

2

## Exhibit 1

Completion of Material delivery log

Project schedule and Liquidated Damages still enforce

Qualified supervision while workers present on site at all times

$2^{nd} - 11^{th}$ floor drywall material including all screws, caulking, tape, mud, and associated accessories

Public area drywall material including all screws, caulking, tape, mud, and associated accessories

Drywall and framing labor $2^{nd} - 11^{th}$ floor

All public area framing interior and exterior labor

All public area drywall interior and exterior labor

All public area underground plumbing and gas

Certified plumber with on site supervision

Certified gas service installer

Balcony tile and waterproofing installation (Owner to provide the following materials for this work—balcony tile, setting materials, and thin set. Crystal to provide labor only for the installation of the balcony tile.)

(Credit flooring) Kitchen, bars, plating room labor and materials    4400 SF
A.G.    N.P.

EIFS labor for all work involved for stucco refinishing and horizontal and vertical expansion/control joints as required

All coordination of exterior subsurface framing and exterior paneling

Qualified Installer for Knotwood and Swiss Pearl panels

Qualified installer for exterior framing materials

Supervision of Oleg Arifov & Ion Curmei to be full time while their crews are on site. & Demitri, Startcey
A.G.
N.P.

All work material and labor shall be per the Contract Documents, including, but not limited to, the Cooper Carrey Drawings and related Specifications as required per the Subcontract.

The $700,000 in compensation being paid to Crystal under Change Order No. 10 shall be paid according to the following table as the below items of work are completed to the satisfaction of Infinity as provided under the Subcontract:

## Crystal Hospitality Change Order No 10

| | Breakdown of CO. #10 | | |
|---|---|---|---|
| 1 Drywall Materials Floors 2nd thru 11th | $ 132,790.00 | | |
| Per floor | | $ | 13,279.00 |
| 2 Public Area Drywall Materials | $ 30,000.00 | | |
| 3 Public Area Framing Materials | $ 50,000.00 | | |
| 4 Drywall labor floors 2nd thru 11th | $ 234,585.00 | | |
| per floor | | $ | 23,458.50 |
| 5 Public Area Framing Labor | $ 52,000.00 | | |
| 6 Public area drywall labor | $ 55,000.00 | | |
| 7 Refinish Wall EIFS Labor | $ 82,625.00 | | |
| 8 Underground Plumbing | $ 63,000.00 | | |
| Concrete cutting | | $ | 8,000.00 |
| Sewer | | $ | 45,000.00 |
| Gas | | $ | 20,000.00 |

| | |
|---|---|
| $ | 700,000.00 |

2

# **<u>EXHIBIT D</u>**



Date:  March 20, 2023

Crystal Hospitality
706 Executive Court
Woodstock, GA 30189

### Re:  Daytona Renaissance Termination of Contract 640 N. Atlantic Ave Daytona Beach, FL 32118

Mr. Gerega,

Please accept this letter as Infinity GCS's ("Infinity") formal notice of default and termination of the Subcontract Agreement (the "Agreement") dated February 1, 2021.

Pursuant to subsection 14.1 of the Agreement, Crystal Hospitality ("Crystal") has committed the following acts of default and given cause for termination of the Agreement:

"Failure to supply sufficient skilled workers, equipment, or materials of proper quality and quantity"

"Failure to prosecute the Work with promptness and diligence"

"Failure in the performance of any of the provision of the Contract Documents"

As Crystal is aware, Infinity has afforded every opportunity for Crystal to bring the project back on to the critical path.  On July 8, 2022, Crystal and Infinity executed Change Order Number 10, providing Crystal with an additional $700,000.00 to address manpower and work quality concerns that Crystal attributed to their initial delays in completing the Work.  On October 11, 2022, Infinity notified your surety, Argonaut Insurance Company, of your continued failure to comply with terms of the Contract Documents.  A meeting was held on November 4, 2022 where Crystal was given the chance to show their work and prove their compliance with the Contract.  Since then, the project continues falter as Crystal commits the same actions that forced Infinity to bring a claim before the surety.  Crystal continues to fail to produce work of sufficient quality and has failed to furnish sufficient skill workers under the terms of the contract.  As a result of this meeting, Crystal, Infinity and the Owners reached an agreement to supplement Crystal's plumbing work, relieving Crystal of the responsibility to purchase materials for the project and allowing Crystal to focus on providing the manpower to complete the project.  Instead of bring the project closer to the critical path, Crystal has failed to  provide the sufficient manpower and has experienced another change in supervisors and crews at the project.  This revolving door has caused the project to fall further behind.  According to the most recent March 8, 2023 update from Palmetto Scheduling, the critical path is currently over 220 days behind based on the July 7, 2022 revised baseline schedule.

Crystal has received monthly updates from the third-party scheduler, attended daily meetings and is aware of the deepening delays on the project.

Due to the delay, Infinity continues to accrue liquidated damages, extended general conditions, attorney's fees and other damages associated with the delays caused by Crystal. Infinity will seek compensation for those damages from your surety and intends to assert all of its rights under the Agreement and performance bond.

Pursuant to subection 14.1 of the Agreement, Crystal is in default of the terms of this contract. The contract is accordingly terminated. This notice and the termination of the Agreement shall become effective 48-hours from the date of this Agreement. Infinity expects Crystal to remove all of its employees, contractors and equipment from the worksite by the expiration of the 48-hour period and cease all of its work. Crystal is prohibited from removing any materials or equipment that belong to Infinity, the Owners or any other subcontractors on the worksite.

Pursuant to section 3.2 of the Performance Bond, this letter shall also serve as Notice to your surety of termination of the Agreement.

Sincerely,

Nick Patel
Infinity GCS
730 S Atlantic Ave, Ste 204
Ormond Beach, FL 32176


Cc:     Stephanie H. Shear
        Barry Page
        Ryan Dry
        Natalia Avery
        Ishwar Naran
        Samir Naran
        Bill Bullen
        Nitesh Patel

# EXHIBIT E



STEVEN CANNON
PARTNER
972.797.9512 TELEPHONE
972.797.9510 FACSIMILE
scannon@drylaw.com

FILE NO. 101.063

May 5, 2023

**VIA EMAIL: ajp@kirwinnorris.com**
**AND CERTIFIED MAIL**

Andrew J. Pekoe
KIRWIN NORRIS
15 W. Church St., Suite 301
Orlando, FL 32801

RE:  Principal:  Crystal Hospitality, LLC ("Principal")
     Surety:     Argonaut Insurance Company (the "Surety")
     Obligee:    Infinity General Construction Services, Inc. ("Obligee")
     Project:    Renaissance; 640 N. Atlantic Ave., Dayton Beach, FL 32811 (the "Project")
     Bond No.:   CMGP00004440 (the "Bonds")

Dear Mr. Pekoe:

As you are aware, our firm represents Argonaut Insurance Company as the performance bond surety for the above-named Principal with regard to the Project identified above. Under full reservation of all rights, defenses, and offsets, this letter is sent to advise you of the status of the Surety's investigation of the claim the Obligee has asserted against the Bond (the "Claim").[1]  The Surety has reviewed the additional documentation you provided in support of the Claim in conjunction with all other materials provided by the Obligee and the Principal during the Surety's investigation. Additionally, the Surety engaged a construction consultant (Forcon International – Tom J. Guinn) to conduct a site visit to investigate the Project. Pursuant to the terms of the Bond, the Surety's obligations, if any, are triggered first upon a default under the subcontract and the Obligee taking certain other actions as outlined in the Bond. The Surety has investigated and determined, based on the information received to date, that the Principal is not in material default of the underlying contract. As such, the Surety hereby denies the Claim. Below is a summary of what the Surety understands to be the relevant facts.

**<u>The Prime Contract:</u>**

On or around December 29, 2020, 640 North Atlantic Hospitality, LLC (the "Owner") entered into a construction contract with Infinity General Construction Services, Inc. (the

---

[1] Any conclusions and/or determinations expressed in this letter regarding the Obligee's Claim against the Bonds are based upon the documentation and information available to the Surety as of the date of this letter. The Surety expressly reserves, amongst other things, the right to modify, supplement, or amend any conclusions and/or determinations expressed in this letter as additional documentation and/or information is made available. Furthermore, please note that this letter is sent to you for investigatory purposes and nothing in this letter should be construed as an admission of liability or a promise to perform or pay any claim in whole or in part.

May 5, 2023
Page 2

"Obligee") for the project commonly known as the Renaissance hotel located at 640 N. Atlantic Ave., Dayton Beach, FL 32811 (the "Project"). Such contract between the Owner and the Obligee is hereinafter referred to as the "Prime Contract." The Prime Contract was executed on an AIA A102-2017 form, where the basis of payment to the Obligee is the cost of the work plus a fee with a guaranteed maximum price. According to the Prime Contract, the guaranteed maximum price was $24,122,334, subject to additions and deductions by Change Order. The Prime Contract further states that the date for substantial completion of the Project shall be 457 calendar days from the commencement of work. According to the documentation provided by the Obligee, no change orders from the Owner have been issued for the Prime Contract.

**The Subcontract:**

On or around February 1, 2021, the Obligee and Crystal Hospitality, LLC (the "Principal") entered into a subcontract agreement for the Project (the "Subcontract"). The price of the Subcontract was $7,150,000. The Obligee agreed in the Subcontract to withhold 10% of payments as retainage under such Subcontract. The Subcontract expressly required a standard AIA payment bond and performance bond equal to 100% of the price of the Subcontract. The Subcontract expressly stated that the premium must be paid by the Principal and the bonds delivered to the Obligee, prior to the commencement of the Principal's work. The scope of work for the Principal on the Subcontract was defined on Exhibit B of the Subcontract as drywall ($1,240,272), plumbing ($1,338,843), electrical ($1,957,065), exterior ($1,003,000), wall finishes ($415,338), floor finishes ($689,987), door install ($168,000), and general conditions ($337,495).

**The Performance Bond:**

In or around April 2021, the Principal requested the required payment and performance bonds from Argonaut Insurance Company (the "Surety"). On or around April 26, 2021, the Obligee submitted a letter to the Surety stating that the Principal's submittals and paperwork on the Project to date were satisfactory and that the Obligee knew of no unpaid laborers, subcontractors, or material suppliers, nor of any back charges or claims against the Principal (including by the Obligee). The Obligee stated further that the Subcontract had been modified to a new contract amount of $5,192,935, that the Subcontract was 0% complete with an anticipated completion date of May 24, 2022, and that no payments had been made on the Subcontract. The Obligee further represented that it was in possession of no facts or information which could lead it to believe that the Principal would have any problem properly performing and completing the Subcontract or paying laborers, subcontractors, or material suppliers. Last the Obligee acknowledged that the Surety is relying on these representations and would not execute bonds for the Principal but for these representations.

On or around May 3, 2021, the corresponding written change order was executed to remove the electrical ($1,957,065) portion of the work from the scope. On or around May 25, 2021, the Surety issued a Payment Bond and a Performance Bond on the AIA A312-2010 forms (Bond No. CMGP00004440) for the Subcontract (the Payment Bond and the Performance Bond are sometimes hereinafter collectively referred to as the "Bonds" or each a "Bond"). Note that the language of the Bond refers to the Obligee as the Owner.

May 5, 2023
Page 3

       The terms of the Performance Bond expressly state the conditions precedent for the Surety's obligations to arise under that Bond. More specifically, the expressed conditions precedent to the Surety's obligations under the Performance Bond, outlined in Section 3 of the Performance Bond, are as follows:

- The Obligee[2] is not in default of the Subcontract;
- The Obligee provides notice to the Principal and the Surety that the Obligee is considering declaring the Principal in default of the Subcontract;
- The Obligee subsequently declares the Principal in default of the Subcontract;
- The Obligee terminates the Subcontract;
- The Obligee notifies the Surety of the declaration of default and termination;
- The Obligee agrees to pay the balance of the Subcontract price to the Surety in accordance with the terms of the Subcontract.

**<u>The Obligee's First Notice To The Surety:</u>**

       On or around October 11, 2022, the Obligee, through counsel, sent correspondence to the Surety alleging that the Principal was causing delays on the Project. More specifically, the Obligee stated "[t]his is not the first time during this Project that [the Obligee] has dealt with a delay cause by [the Principal]," but this was the first notice to the Surety. The Obligee stated that the new agreed to date for substantial completion of the Subcontract is May 23, 2023. The Obligee further stated that it was considering declaring the Principal in default of the Subcontract, alleging that the Principal had failed to produce work of a sufficient quality and has failed to furnish sufficient skilled workers. No supporting documentation was provided with such correspondence.

       On October 13, 2022, the Surety, through counsel, sent correspondence to the Obligee acknowledging the Claim and the request for a conference under Section 3.1 of the Performance Bond. The Surety, with its correspondence on October 13, 2022, sought to schedule the requested conference and also requested certain documentation to investigate the Claim of the Obligee. The Surety also directed the Obligee, pursuant to the terms and conditions of the Bond and general principles of surety law, not to take any steps with respect to completion of the Subcontract, as such actions will clearly prejudice the rights of the Surety. The Section 3.1 conference occurred by phone on or around October 21, 2022, without receipt of any documents from the Obligee. The conference was continued while the Surety awaited receipt of documents from the Obligee to fully understand the status of the Project. Further, the parties agreed to meet in person at the Project site on November 4, 2022.

**<u>The November Site Visit:</u>**

       The Surety, through the undersigned counsel, and its consultant attended the continued Section 3.1 on November 4, 2022 at the Project site. At that meeting, the Obligee expressed its concerns with the Principal's work force and quality of work, and the Principal expressed its disputes with the Obligee's allegations. The Surety, still not having any documentation from the

---

[2] Note that the language of the Bond refers to the Obligee as the Owner. This letter will refer to Infinity General Construction Services, Inc. as the Obligee.

May 5, 2023
Page 4

Obligee, simply received the concerns of the parties, and its consultant observed the status of the Project. The Surety reiterated its request to the Obligee for documentation at this meeting. Ultimately, the Principal and the Obligee agreed that the Principal would continue work on the Project.

**The Obligee's Refusal To Provide Documents:**

Following the November 4, 2022 conference, the Surety understood that the Principal and the Obligee continued working together in furtherance of the Project. Then on February 10, 2023, the Obligee then wrote another letter, dated February 9, 2023, to the Surety. That correspondence included a scheduling analysis from Palmetto Scheduling, LLC. The Obligee also stated that it has engaged a supplemental contractor to work on the plumbing scope of work on the Project and was purchasing materials directly for the Principal's scope of work. The Obligee also alleged that the Principal was beginning to fall behind on the framing portion of the Subcontract and that the Owner was getting involved in the disputes over the Subcontract between the Principal and the Obligee. In closing, the Obligee falsely claimed it "has since provided documents requested by the Surety."

As a result of the Obligee's false statements about the provision of requested documentation to the Surety, the Surety was forced to respond on February 20, 2023, to correct the Obligee's incorrect statements regarding documentation. In short, the Surety outlined the timeline and the Surety's multiple requests for documentation from the Obligee, again pointing out that the Surety had not received any documents. In case of any error, the Surety asked that if the Obligee still believes it had provided documentation in response to the Surety's request, then the Obligee should identify the recipient, the date, and the method of such correspondence.

**The Obligee's Failure To Comply With The Terms Of The Performance Bond:**

In response to the Surety's correspondence, on February 21, 2023, the Obligee sent a demand letter to the Surety alleging that the Surety has failed to perform its obligations under the Performance Bond. More specifically, the Obligee stated that "[t]he Surety has not proceeded with reasonable promptness as required by sections 5 and 6 of the Performance Bond." The Obligee claimed that it had met all the conditions of Section 3.1 of the Performance Bond, such that it believed the Surety's obligations under the Performance Bond had arisen. The Obligee attempted to claim that the Surety's excuse for non-performance of the alleged obligation was the Obligee's failure to provide documents in response to the Surety's request.

In other words, the Obligee was alleging that by conducting the 3.1 Conference, the Obligee had done all it was required to do under the Performance Bond to trigger the Surety's obligations, if any, under the Performance Bond. Further the Obligee refused to correct its false statement about providing documents to the Surety, and instead, without directly stating it, acknowledged that it had failed to provide the Surety with any documentation. The Obligee cited case law that was wholly irrelevant and misapplied to the situation to incorrectly argue that the Obligee had no duty or obligation to cooperate with the Surety's requests for information and documentation. This February 21, 2023, again acknowledged the engagement of a supplemental contractor without the Surety's consent. In closing the Obligee incorrectly alleged that it has complied with all conditions precedent under the Performance Bond and asserted a seven-day

May 5, 2023
Page 5

notice on the Surety to take action under Section 5 of the Performance Bond, citing Section 6 for authority.

As a result of the Obligee's entirely incorrect statements and assertions in its February 21, 2023, the Surety was forced to respond to the Obligee on March 2, 2023, this time to invite the Obligee to read the terms of the Performance Bond and again point out that the Obligee acknowledged that it had yet to provide documents in response to the Surety's request. More specifically, the Surety pointed out to the Obligee that the Surety's obligation, if any, under Section 5, does not arise simply because of the Obligee's compliance with Section 3.1 as claimed by the Obligee, but that Section 5 of the Performance Bond explicitly requires the Obligee's satisfaction of the plural *conditions* of Section 3. The Surety also pointed out that the case law relied on by the Obligee (the *Archer Western* case) is completely different bond language (AIA A311 versus AIA A312).

**The Obligee's Wrongful Termination Of The Principal:**

By letter dated March 20, 2023, but not emailed to and received by the Surety until March 21, 2023, the Obligee submitted formal notice of default and termination of the Subcontract to the Principal. The Obligee alleged that the Principal failed (i) to supply sufficient skilled workers, equipment, or materials of proper quality and quantity, (ii) to prosecute the work with promptness and diligence, and (iii) to perform the provisions of the Subcontract. That letter specifically stated that Subcontract was "accordingly terminated" under Section 14.1 of the Subcontract, claiming to "become effective 48-hours [*sic*] from the date of this Agreement."

In response to this notice of termination, on March 22, 2023, the Surety sent correspondence to the Obligee acknowledging receipt and again requesting the same documentation it requested over five months prior, to which the Obligee refused to provide. Some select documents were provided by the Obligee on March 28, 2023, but numerous documents were still missing. Some additional documents were then provided on April 4, 2023, but still not everything requested by the Surety. On April 10, 2023, the Surety, with its consultant, conducted a second Project site walk with the Obligee and the Principal.

**The Surety's Determination On The Performance Bond Claim:**

From the Obligee's correspondence, it is clear that the Obligee's complaint of the Principal is simply that the Obligee believes the Principal was not working fast enough on its scope of the Project. However, from the Surety's review of the Project site with its consultant, along with the review of the limited documentation supplied and the response of the Principal, it is clear that it is not the Principal who is at fault for the delayed Project. The facts and documentation show that (1) the Obligee has mismanaged this Project from the start, (2) another subcontractor has defaulted and/or caused delayed which hinders performance by the Principal, (3) the Obligee failed to provided plans and specifications free of defects, (4) the Obligee's termination of the Principal was inappropriate and wrongful, (5) the Obligee supplemented the Principal's work on the Project without the Surety's consent, and (6) performance by the Principal or the Surety would be impossible given the Obligee's inability to appropriately coordinate and sequence the Project. All

May 5, 2023
Page 6

of these situations give the Surety adequate reason and authority to deny the Obligee's Performance Bond claim.[3]

**Delays Not The Fault Of Principal:**

With regard to the Obligee's allegation that the Principal has failed to provide adequate manpower and/or supervision on the Project, the Obligee has failed to provide any legitimate information or evidence on what aspects of the Project the Principal is delaying. The Obligee has only made general allegations that the Principal's manpower and/or supervision is inadequate and the Project is delayed, but the Obligee has failed to provide any specifics as to how the Principal, and no other subcontractor or the Obligee itself, is delaying the critical path of the Project. Further, as observed by the Surety's consultant, there are numerous other trades that are behind schedule resulting in delays and hindering the Principal's performance of the Subcontract and the Project as a whole. As such, the Principal has reasonably disputed that it is in default on the Project.

**Obligee Default/Material Breach:**

The terms of the Performance Bond explicitly state that a condition precedent is that the obligee is not in default under the Subcontract. Default of the obligee (or Owner Default as stated in the terms of the Bond) is expressly defined under the terms of the Performance Bond as "Failure of the [Obligee], which has not been remedied or waived, to pay the [Principal] as required under the [Subcontract] or to perform and complete or comply with the other material terms of the [Subcontract]." Courts across the country have enforced this provision as a condition precedent to the Surety's obligation. *Milton Reg'l Sewer Auth. v. Travelers Cas. & Sur. Co. of Am.*, 648 Fed. App'x 215, 216-17 (3d Cir. 2016) (excusing the surety's performance under the bond finding the owner failed to comply with the terms of the bonded contract's right-to-cure provision); *Borough v. Peter V. Pirozzi Gen. Contracting*, No. 2:13-cv-01470-PBT, 2015 U.S. Dist. LEXIS 45079 (E.D. Pa. April 7, 2015) (holding that owner's failure to comply with the contract's termination provision constituted an owner default); *Deluxe Bldg. Sys. V. Constructamax, Inc.*, No. 2:06-cv-02996 (KM)(MAH), 2013 U.S. Dist. LEXIS 126866 (D.N.J. Sept. 5, 2013). In other words, an obligee's material breach of the bonded contract excuses the performance obligation of the principal, and as a result, a surety's performance obligation under the bond is also excused as the surety is entitled to the defenses of its principal. *See Bank of Brewton, Inc. v. International Fid. Ins. Co.*, 827 Sp. 2d 747 (Ala. 2002).

**Failure To Provide Plans And Specifications Free From Defects:**

Under the *Spearin* Doctrine, when a principal is required to build according to plans and specifications provided by the obligee, the principal will not be responsible for the consequences of any defects contained in the plans. Further, the principal will not be responsible for delays associated with changes in the plans and specifications. Here, the Obligee's plans and specifications had numerous defects and were changed on numerous occasions. Most, if not all, of these changes resulted in delays to the Project. In some instances, the defects were not remedied,

---

[3] The Surety further contends that the correspondence between the Principal and the Obligee provide additional factual defenses that would further relieve the Surety of any liability. Given the applicable defenses outlined herein, these additional defenses need not be addressed in this correspondence.

May 5, 2023
Page 7

which also resulted in further delay of the Project. None of these delays were the fault of the Principal.

**Failure To Mitigate:**

An obligee owes a surety an opportunity to mitigate its damages. More specifically, and as explained by the Northern District of Florida, "[c]ourts have consistently held than an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void." *School Board of Escambia County, Florida v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351 (N.D. Fla. May 8, 2000).

The Surety is not liable under the Performance Bond, because the Obligee failed to act in a timely fashion, thereby stripping the Surety of its contractual right to mitigate damages. The Obligee alleges that the Principal was causing delays on the Project as early as April 2022, but waited until March 2023, nearly a year later to terminate the Principal and trigger the Surety's obligations under the Performance Bond.

In addition, as outlined in more detail above, the Surety, on numerous occasions, attempted to investigate the status of the Project by requesting reasonable documentation from the Obligee, yet the Obligee intentionally and expressly refused to provide the Surety with the requested documentation for nearly six months. The Obligee's interference with the Surety's contractual right to minimize its liability under the Performance Bond relieves the Surety of any liability under the Performance Bond.

**Impossibility Of Performance:**

It is well settled law that "[w]here, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises." *See* Restatement of Contracts § 266(1). In applying the Restatement of Contracts to this situation, the Obligee's inability to properly sequence and coordinate the multiple trades on the Project made it impossible for the Principal to adequately and timely perform its work under the Subcontract. When the Principal entered into the Subcontract with the Obligee, it had no reason to believe that the Obligee would be unable to perform its construction management tasks on the Project, which occurred due to no fault of the Principal. Therefore, the Principal's performance under the Subcontract, and thus the Surety's performance under the Performance Bond, would be impossible, resulting in a discharge of the Principal's and Surety's respective obligations.

**Conclusion:**

In sum, based upon the Surety's review of the documents provided by the Obligee, the response of the Principal, and the Surety's and its consultant's investigation of the Project status, at most, there appears to be a bona fide dispute between the parties that the Surety views as a sufficient basis to conclude the Principal's defenses to the Obligee's Claim, in addition to the

May 5, 2023
Page 8

Surety's own defenses, could have merit. Because the obligations of a performance bond surety arise from the obligations of the principal, a surety's obligations are only triggered upon the demonstrated default of the principal. Stated another way, as the Surety's obligations as surety under the performance bond are secondary to that of the Principal, the Surety's role, as surety, is not to intervene in the type of dispute that exists here, but to leave the parties to resolve the dispute in a manner they deem proper.

Because there appears to be a sufficient basis for the Surety to question the validity of the Obligee's Claim pending further documentation/information and/or a determination by a trier-of-fact, the Surety denies the Claim at this time. Please feel free to respond in the event you possess documents and/or information that you believe would alter the Surety's determination that a bond fide dispute exists.

This communication and all prior or subsequent communications and/or investigative efforts are made with a full and complete reservation of all rights, defenses, claims or setoffs, including without limitation, those based on timely compliance with applicable notice requirements and statutory or contractual periods of limitation, available to Argonaut Insurance Company and/or any of our affiliates, subsidiaries, agents, divisions, successors, or assigns, whether at law or in equity. The Surety's reservation of rights shall remain in full force and effect unless expressly waived by us, in writing.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Steven Cannon

cc:   Stephanie H. Shear (*via email*)
      Ryan D. Dry (*via email*)
      James "Joby" Birr (*via email*)